57 F.3d 1340
 64 USLW 2064, 4 A.D. Cases 974, 11
A.D.D. 253, 6 NDLR P 371
 Anthony TORCASIO, Plaintiff-Appellee,
v.
Edward W. MURRAY, Director; G.L. Bass, Deputy Warden; Mary
Sue Terry; Steven D. Rosenthal;
Rufus Fleming; David L. Robinson; R.J. Beck; G.P. Dodson,
Defendants-Appellants,
and
Vosbeck/DMJM, Defendant.
 No. 94-7206.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 3, 1995.
Decided June 29, 1995.
 
 ARGUED: Mark Ralph Davis, Asst. Atty. Gen., Office of the Atty. Gen., Crim. Law Div., Richmond, VA, for appellants. Nancy Braverman Blume, Hughes, Hubbard & Reed, New York City, for appellee. ON BRIEF: James S. Gilmore, III, Atty. Gen., VA, Jill Bowers, Asst. Atty. Gen., Crim. Law Div., Office of the Atty. Gen., Richmond, VA, for appellants. Daniel H. Weiner, Hughes, Hubbard & Reed, New York City, Douglas M. Cott, Spirer & Cott, Westport, CT, for appellee.
 Before WIDENER and LUTTIG, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 Affirmed in part and reversed in part by published opinion. Judge LUTTIG wrote the opinion, in which Judge WIDENER and Senior Judge PHILLIPS joined.
 OPINION
 LUTTIG, Circuit Judge:
 
 
 1
 We consider in this case whether the district court erred when it partially denied qualified immunity to officials of the Virginia Department of Corrections (VDOC) in a suit by a morbidly obese inmate under section 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. Sec. 794, and Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. Sec. 12132. We conclude that, at the time of the alleged violations, it was not clearly established that these acts applied to state prisoners, or that an obese individual such as appellee Anthony Torcasio was entitled to the protections of either act. We also find that the VDOC officials reasonably could have believed that their actions did not violate any right Torcasio had to modifications in his milieu at the Keen Mountain Correctional Center. Given our determination that the appellant prison officials are entitled to qualified immunity as to all of Torcasio's claims, we affirm the judgment of the district court to the extent that it found the appellants immune, and reverse to the extent that it did not.
 
 I.
 
 2
 Appellant Anthony Torcasio suffers from what he describes as "morbid obesity." He stands five feet, seven inches tall, weighs 460 pounds, and has a girth of 78 inches. His obesity, he claims, causes him a variety of physical discomforts, including back pain and sleep apnea. He is unable to walk long distances, incapable of standing or lying down for prolonged periods of time, and susceptible to losing his balance. In a memorandum he filed with the district court, Torcasio characterized his day-to-day existence as "a life of misery and heartache." J.A. at 87.
 
 
 3
 Torcasio spent three years as an inmate in the Virginia Department of Corrections, residing at a total of four correctional facilities. The present claim relates principally to his time at VDOC's Keen Mountain facility, where Torcasio was housed from April 22, 1993, until he was paroled in the spring of 1994. During his incarceration, Torcasio presented VDOC officials with a lengthy and ever-increasing list of modifications which he insisted were necessary to accommodate his obese condition. Thus, he demanded a larger cell, a cell closer to the support facilities, handrails to assist him in using the toilet, wider entrances to his cell and the showers, non-skid matting in the lobby area, and alternative outdoor recreational activities to accommodate his inability to stand or walk for long periods of time. When the VDOC officials failed to grant him all of these accommodations, Torcasio filed this action, contending that the officials' intransigence violated "the federal laws enacted by the legislative mandate of the United States Congress that federally protects and ensures the rights of the physically disabled person."[1] See J.A. at 13, 77. Torcasio sought injunctive relief as well as monetary damages.[2] In the spring of 1994, as this case was proceeding in district court, Torcasio was paroled. The district court accordingly dismissed those portions of Torcasio's complaint that sought injunctive relief. Proceeding to the remainder of the claims, the district court first held that the ADA and the Rehabilitation Act do apply to state prisoners, thereby rejecting the argument of the VDOC officials that the acts do not apply in this context. See Torcasio v. Murray, 862 F.Supp. 1482, 1490-91 (E.D.Va.1994). The court then addressed the question at issue in this appeal, namely, whether the officials were entitled to qualified immunity. The court first determined that "it is clear that correctional facilities were subject to the provisions of the ADA and Rehabilitation Act" at the time of Torcasio's incarceration at Keen Mountain, id. at 1493; this was the extent of the court's inquiry into the essential question of whether the right allegedly violated by the officials--"a morbidly obese inmate's right to the modification of specific services and facilities," id.--was clearly established. Having found, to that extent, that the right at issue was clearly established, the court proceeded to analyze, literally request by request, whether the VDOC officials' responses to Torcasio's requests for accommodation were reasonable. The court concluded that, with respect to Torcasio's complaints about access to the shower, outdoor recreational activities, and his cell, the officials were entitled to qualified immunity, while they were not so entitled on Torcasio's complaints about his toilet, his cell door, and the dining facilities. See id. at 1493-95. The Commonwealth then filed this interlocutory appeal challenging the partial denial of qualified immunity.
 
 
 4
 Our review of the record convinces us that the district court erred in not granting the defendant prison officials' motion for summary judgment on the basis of qualified immunity as to all of Torcasio's claims. "Government officials are protected by qualified immunity 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " DiMeglio v. Haines, 45 F.3d 790, 794 (4th Cir.1995) (quoting Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)). "In analyzing a claim of qualified immunity it is ... necessary first to identify the specific ... right allegedly violated, then to inquire whether at the time of the alleged violation it was clearly established, then further to inquire whether a reasonable person in the official's position would have known that his conduct would violate that right." Collinson v. Gott, 895 F.2d 994, 998 (4th Cir.1990) (Phillips, J., concurring) (citing Mitchell v. Forsyth, 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In our view, proper application of these principles leads inexorably to the conclusion that the VDOC officials are fully entitled to qualified immunity in this case, because the right Torcasio contends was violated was not clearly established at the time of the alleged violations, and because the actions of the VDOC officials reasonably could have been thought consistent with any rights Torcasio might have had.[3]
 
 II.
 
 5
 Torcasio contends that by refusing to grant his requested accommodations, officials at Keen Mountain violated "a morbidly obese inmate's right to the modification of specific [prison] services and facilities." Appellee's Br. at 38. The district court found that this right was clearly established during the time Torcasio was incarcerated. We cannot agree.
 
 
 6
 First, it was not clearly established at that time that the ADA and Rehabilitation Act--the two acts upon which Torcasio's claim of a right to modification of services and facilities is predicated--applied to state prisons. Second, even if it were clear that Torcasio, as a prisoner in a state facility, was protected by the Rehabilitation Act and the ADA, it was not clearly established that, as a "morbidly obese" individual, he qualified as an "individual with a disability" protected under either act.
 
 A.
 
 7
 In attempting to demonstrate that, at the time he was imprisoned at Keen Mountain, it was "clearly established" that state prisons were subject to the strictures of the ADA and the Rehabilitation Act, Torcasio begins, appropriately, with the language of the two statutes. He contends that there can be no doubt that the ADA and the Rehabilitation Act apply to state prisons, because both acts are written in broad terms that clearly encompass state prisons.
 
 1.
 
 8
 Although when viewed in their entirety, the ADA and the Rehabilitation Act are not so broad as Torcasio suggests, see infra p. 1346, Torcasio is correct to observe that certain portions of both statutes employ language which, when viewed in isolation, appears all-encompassing. Title II of the ADA outlaws discrimination against the disabled by "public entities," a term which, as Torcasio notes, includes "any State or local government" and "any department, agency ... or other instrumentality of a State or States or local government." 42 U.S.C. Sec. 12131(1) (emphasis added). The Rehabilitation Act, similarly, prohibits discrimination against disabled individuals "under any program or activity receiving Federal financial assistance," 29 U.S.C. Sec. 794(a) (emphasis added), and defines "program or activity" to include "all of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. Sec. 794(b)(1)(A). We are not persuaded that this language, however, even viewed in isolation from the arguably narrowing text found elsewhere in the acts, brings state prisons "squarely" within the reach of these acts.
 
 
 9
 Were we presented with the question whether these acts apply to a state entity other than a prison, we might come to our task with a somewhat different jurisprudential mindset. We are hesitant to extend the coverage of the acts to state prisons, however, and especially reluctant to conclude that the applicability of the acts to state prisons was at a given point "clearly established," absent a far clearer expression of congressional intent.
 
 
 10
 In Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court described as an "ordinary rule of statutory construction" the principle that:
 
 
 11
 if Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute." Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); see also Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984).... Congress should make its intention "clear and manifest" if it intends to pre-empt the historic powers of the States, Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), or if it intends to impose a condition on the grant of federal moneys, Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981); South Dakota v. Dole, 483 U.S. 203, 207, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987). "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971).
 
 
 12
 Will, 491 U.S. at 65, 109 S.Ct. at 2309. The Court has thus instructed that where application of a federal statute to a state "would upset the usual constitutional balance of federal and state powers[,] ... 'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance." Gregory v. Ashcroft, 501 U.S. 452, 460, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991) (quoting Atascadero, 473 U.S. at 243, 105 S.Ct. at 3147). See also United States v. Lopez, --- U.S. ----, ----, 115 S.Ct. 1624, 1655, 131 L.Ed.2d 626 (1995) (Souter, J., dissenting) (clear statement rule applicable where case "implicat[es] Congress's historical reluctance to trench on state legislative prerogatives or to enter into spheres already occupied by the States."); Davies Warehouse Co. v. Bowles, 321 U.S. 144, 154, 64 S.Ct. 474, 480, 88 L.Ed. 635 (1944) ("The existence and force and function of established institutions of local government are always in the consciousness of lawmakers and, while their weight may vary, they may never be completely overlooked in the task of interpretation.").
 
 
 13
 It cannot be disputed that the management of state prisons is a core state function. As the Supreme Court has stated, "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." Preiser v. Rodriguez, 411 U.S. 475, 491-92, 93 S.Ct. 1827, 1837, 36 L.Ed.2d 439 (1973). Indeed, it is elementary that "maintenance of penal institutions is an essential part" of one of government's "primary functions"--"the preservation of societal order through enforcement of the criminal law." Procunier v. Martinez, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). The fact that management of state prisons is a core function of the state sovereign, and is not presumptively subject to federal control, played a significant role in our recent decision in Harker v. State Use Industries, 990 F.2d 131 (4th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993), in which we held that state prisoners involved in an employment skills development program in prison were not entitled to the minimum wage specified in the Fair Labor Standards Act (FLSA). See id. at 133 ("Even with a broad reading of this term ['employee'], we see no indication that Congress provided FLSA coverage for inmates engaged in prison labor programs like the one in this case."); id. at 136 ("If the FLSA's coverage is to extend within prison walls, Congress must say so, not the courts."). See also Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320, 1325 (9th Cir.1991) (Opinion of Trott, J.) ("It is equally plausible, if not more so, that in view of the manifest purpose of Congress in enacting the FLSA, it did not cross any member's mind--even for a moment--that felons serving hard time in prison and working in the process would be covered by this economic protection. I reject as almost whimsical the notion that Congress could have intended such a radical result as bringing prisoners within the FLSA without expressly so stating. There are obvious policy considerations in such a result that should be openly addressed by Congress, not the courts.").[4]
 
 
 14
 That the management of state prisons is to be left to the states, as free as possible of federal interference, is confirmed by a long line of Supreme Court precedent, which we recently had occasion to review in the context of an Eighth Amendment challenge to prison conditions at a state facility. In that context, we concluded that "absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or to substitute their judgment for that of the trained penological authorities charged with the administration of such facilities." Taylor v. Freeman, 34 F.3d 266, 268 (4th Cir.1994) (citing Turner v. Safley, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259-60, 96 L.Ed.2d 64 (1987); Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981); Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979); Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), overruled on other grounds, Thornburgh v. Abbott, 490 U.S. 401, 413-14, 109 S.Ct. 1874, 1881-82, 104 L.Ed.2d 459 (1989); Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)). See also Inmates of Occoquan v. Barry, 844 F.2d 828 (D.C.Cir.1988). Although the unwillingness of federal courts to intrude into state prison management is in part due to the fact that the judiciary lacks the expertise of the executive and the legislature in such matters, it is in significant measure motivated by the realization that principles of comity and federalism apply with special force in the context of correctional facilities. See, e.g., Preiser, 411 U.S. at 492, 93 S.Ct. at 1837 ("[The] internal problems of state prisons involve issues so peculiarly within state authority and expertise."); Martinez, 416 U.S. at 405, 94 S.Ct. at 1807 ("[W]here state penal institutions are involved, federal courts have a further reason [in addition to the inefficacy of judicial intervention] for deference to the appropriate authorities."); Turner, 482 U.S. at 85, 107 S.Ct. at 2259.
 
 
 15
 There can be little question that application of the ADA and Rehabilitation Act would have serious implications for the management of state prisons, in matters ranging from cell construction and modification, to inmate assignment, to scheduling, to security procedures. That the acts threaten to intrude so significantly upon the management of state prisons was fully recognized by the Ninth Circuit, which observed in Gates v. Rowland, 39 F.3d 1439 (9th Cir.1994), that "[t]he Act was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the Act to apply to prison facilities irrespective of the reasonable requirements of effective prison administration." Id. at 1446-47. This recognition in fact led the Ninth Circuit to substantially limit its earlier holding that the Rehabilitation Act is applicable to state prisons, see infra n. 7.
 
 
 16
 Given the significant implications of application of the ADA and Rehabilitation Act for the management of state prisons, and therefore for federal-state relations, we simply cannot agree with Torcasio's assertion that the broad, non-specific language contained in the isolated portions of the acts upon which he focuses "clearly establishes" that state prisons are within the acts' coverage. Because the management of state prisons implicates "decision[s] of the most fundamental sort for a sovereign entity," Gregory, 501 U.S. at 460, 111 S.Ct. at 2400, Congress must speak unequivocally before we will conclude that it has "clearly" subjected state prisons to its enactments.
 
 2.
 
 17
 As we have emphasized above, see supra pp. 1343-44, the seemingly absolute language of 42 U.S.C. Sec. 12131(1) and 29 U.S.C. Sec. 794(b)(1)(A), upon which Torcasio focuses, is not freestanding; these provisions, and their broad language, must of course be read in conjunction with the other operative provisions of the ADA and the Rehabilitation Act. These other provisions are much less naturally read as including state prisons than are the aforementioned provisions.[5]
 
 
 18
 Title II of the ADA, upon which Torcasio's ADA claim is based, states that
 
 
 19
 no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
 
 
 20
 42 U.S.C. Sec. 12132. The Rehabilitation Act employs virtually identical language. See 29 U.S.C. Sec. 794(a) ("No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). We imagine that most prison officials would be surprised to learn that they were subject to these laws: "[p]rison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody," Martinez, 416 U.S. at 404, 94 S.Ct. at 1807; they generally do not provide "services," "programs," or "activities" as those terms are ordinarily understood. A prohibition on discrimination in those three realms thus would not seem to reach prisons.
 
 
 21
 Similarly, the definition of "qualified individual with a disability" is not naturally read as encompassing inmates in state prisons. Title II of the ADA defines a "qualified individual with a disability," against whom discrimination is forbidden, as
 
 
 22
 an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.
 
 
 23
 42 U.S.C. Sec. 12131(2). A prisoner is not normally thought of as one who would have occasion to "meet[ ] the essential eligibility requirements" for receipt of or participation in the services, programs, or activities of a public entity. The terms "eligible" and "participate" imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will.
 
 
 24
 It is thus only through a superficial reading of the statutes that Torcasio can assert that they clearly encompass state prisons and prisoners. The recognition that the terms of the ADA and Rehabilitation Act are ill-fitting, at best, in the context of correctional facilities, reinforces our conclusion that the applicability of the acts to state prisons is far from clear on the face of the laws.
 
 B.
 
 25
 Torcasio might be able to overcome the facial ambiguity of the ADA and Rehabilitation Act, and demonstrate that the applicability of the acts to state prisons was clearly established, if he were able to show that the courts have uniformly interpreted the acts as applying to state prisons, or if he were able to point to regulations that make that applicability clear. His attempts on both scores fail to persuade us, however.
 
 1.
 
 26
 Torcasio claims that "courts have consistently held that the ADA applies to state prisoners' claims." Appellee's Br. at 25. We read the case law differently.
 
 
 27
 Three of the six cases Torcasio cites to show this consistent pattern of judicial interpretation are unpublished cases. See id. (citing Wagner v. Jett, No. 94-5522, 1994 WL 532930 (6th Cir. Sept. 30, 1994) (per curiam ) (unpublished); Candelaria v. Coughlin, No. 93 Civ. 3212, 1994 WL 119146 (S.D.N.Y. April 4, 1994) (unpublished); Outlaw v. City of Dothan, No. CV-92-A-1219-S, 1993 WL 735802 (M.D. Ala. April 27, 1993) (unpublished)). We generally look with disfavor upon citation of unpublished dispositions, see I.O.P. 36.6, and have all the more reason to do so in this case, as citation of unpublished opinions seems an unusually ineffective, and even counterproductive, means of demonstrating that a given proposition of law was "clearly established."
 
 
 28
 Furthermore, only one of the three unpublished opinions in question held what Torcasio claims. See Outlaw, 1993 WL 735802, at * 4 ("[U]nder common usage and understanding of the terms the jail and all of its facilities ... constitute a service, program, or activity of the City of Dothan to which the ADA applies."). Candelaria in no way "held that the ADA applies to prisons." What the court did hold was simply that an inmate's Eighth Amendment claim alleging inadequate medical treatment at a prison known as Green Haven "may not be dismissed at this juncture." Candelaria, 1994 WL 119146, at * 7. The only mention of the ADA in the case came in dicta: the court noted in a footnote that
 
 
 29
 [t]he quality of Candelaria's health care appears to have deteriorated significantly upon his transfer to Clinton [a prison not implicated in the litigation before the court]. For example, Candelaria claims he is now denied physical therapy, handicapped accessible law library facilities, flush toilets as well as catheters, rectal suppositories and medications that were previously made available to him at Green Haven. These claims are potentially legitimate causes of action under both the Eighth Amendment and the Americans With Disabilities Act, codified at 42 U.S.C. Sec. 12101 et seq. However, as noted above, [an earlier order] precludes this Court's appraisal of such questions.
 
 
 30
 Id. at * 7 n. 2 (emphasis added). For Torcasio to contend that this dicta amounts to a holding that the ADA applies to prisons is simply disingenuous.
 
 
 31
 The Sixth Circuit's unpublished Wagner decision not only postdated Torcasio's release from Keen Mountain, but moreover did not, as Torcasio asserts, "h[o]ld that the ADA applies to state prisoners' claims." Rather, the court in a per curiam opinion affirmed the award of summary judgment to prison officials on an ADA claim brought by an inmate, on the grounds that the officials simply had not "treat[ed] disabled inmates unequally under the law." Wagner, 1994 WL 532930, at ** 2. Significantly, although the prison officials apparently did not contend that the law was inapplicable to state prisons, and thus the court had no occasion to consider the question, the court strongly articulated the rationale for not applying the ADA to state prisons:
 
 
 32
 Prison authorities are entitled to adopt and execute policies and practices that in their judgment are needed to preserve institutional security, even if it requires treating disabled inmates somewhat differently.
 
 
 33
 Id. The court also acknowledged the need to balance accommodation of disabilities with "legitimate penological interests such as security concerns." Id.
 
 
 34
 Aside from the unpublished cases, Torcasio points to three published district court opinions that, in his view, found the ADA applicable to state prisoners. Even a cursory reading of these cases, however, discloses that Torcasio misrepresents their import. Although all three involved prisoners proceeding under the ADA, none even squarely addressed the question of the ADA's applicability to prisons, much less held that the ADA so applies. In Noland v. Wheatley, 835 F.Supp. 476 (N.D.Ind.1993), for example, the defendants did not argue that the ADA was inapplicable to state prisons, and thus the court did not consider the issue. Instead, the defendants unsuccessfully moved to dismiss the inmate's ADA claim on the grounds that the ADA was not in effect while the plaintiff was in jail, and that the plaintiff was required to exhaust his administrative remedies prior to coming to court. Id. at 482-83.[6] In Harrelson v. Elmore County, 859 F.Supp. 1465 (M.D.Ala.1994), the court likewise was not called on to resolve whether the ADA applies to state prisons; all that was before the court in that case, insofar as the ADA is concerned, was the officials' motion to dismiss the inmate's claim for punitive damages under the ADA, which the court granted. Id. at 1468-69. Finally, Clarkson v. Coughlin, 145 F.R.D. 339 (S.D.N.Y.1993), provides less support still for Torcasio's assertion, as the court in that case simply held--in only five sentences--that a group of deaf inmates would be permitted to amend their complaint to add a claim under the ADA. Id. at 348.
 
 
 35
 Excepting one unpublished opinion, then, courts that have considered suits brought by state prison inmates under the ADA have at most simply assumed that the act applies to state prisons. In no published case has a court been squarely confronted with--much less rejected--the claim that the ADA is inapplicable to state prisoners. We therefore are not persuaded by Torcasio's argument that "courts have consistently held that the ADA applies to state prisoners' claims."
 
 2.
 
 36
 Torcasio's claim that "courts have consistently held that [the Rehabilitation Act] applies to prisons receiving federal financial assistance" is somewhat more substantiable, but not enough so to meet the "clearly established" requirement.
 
 
 37
 At the time of the alleged violations, the Ninth Circuit was the only court of appeals that had squarely held that the Rehabilitation Act applies to prisons. See Bonner v. Lewis, 857 F.2d 559 (9th Cir.1988). The Ninth Circuit found persuasive the "broad language" argument Torcasio advances in this case, see supra pp. 1343-46, and also noted that "the Act's goals of independent living and vocational rehabilitation should in fact mirror the goals of prison officials as they attempt to rehabilitate prisoners and prepare them to lead productive lives once their sentences are complete. By ensuring that inmates have meaningful access to prison activities, such as disciplinary proceedings and counseling, the goals of both the institution and the Rehabilitation Act are served." Bonner, 857 F.2d at 562.[7] Bonner has since been cited by a number of district courts considering Rehabilitation Act claims brought by prison inmates. See Donnell C. v. Illinois State Board of Education, 829 F.Supp. 1016, 1020 (N.D.Ill.1993) ("Contrary to defendants' assertion, the Act is applicable to inmates at correctional facilities."). Casey v. Lewis, 834 F.Supp. 1569, 1583-85 (D.Ariz.1993) (no claim of non-applicability raised by defendants) (holding that "plaintiffs failed to establish violations of Section 504 of the Rehabilitation Act of 1973").
 
 
 38
 Torcasio claims that the Eleventh Circuit has also "held" that the Rehabilitation Act applies to prisoners, but this is an overstatement. In Harris v. Thigpen, 941 F.2d 1495 (11th Cir.1991), the issue was not before the court, because the Alabama Department of Corrections had "concede[d] that [the Rehabilitation Act] applies to prisoners." Id. at 1522. In a footnote, the court noted, in dicta, that
 
 
 39
 Only the Ninth Circuit appears to have specifically addressed the issue of whether [the Rehabilitation Act] extends to prisoner claims, [citing Bonner ], finding that the broad language of the Rehabilitation Act covering "any program" that receives federal financial assistance, and with [sic] the congruence of the Act's goals with those of prison officials, suggest that prisoner claims are potentially cognizable under [the Rehabilitation Act]. We agree.
 
 
 40
 Id. at 1522 n. 41. See also Sites v. McKenzie, 423 F.Supp. 1190, 1197 (N.D.W.Va.1976) (no non-applicability defense raised by state) (granting state inmate's motion for partial summary judgment on claim that denial of vocational rehabilitation opportunities to mentally ill prisoners violates Rehabilitation Act).
 
 
 41
 While, as of the time Torcasio was incarcerated, one circuit had held that the Rehabilitation Act applies to state prisoners, and another had expressed its approval in dicta for that holding, a third circuit had held that the Act is inapplicable to federal prisoners. In Williams v. Meese, 926 F.2d 994 (10th Cir.1991), the Tenth Circuit held that a federal prisoner could not invoke the Rehabilitation Act because "the Federal Bureau of Prisons does not fit the definition of 'programs or activities' governed by [the Rehabilitation Act]." Id. at 997. The significance of Williams for the question of whether the Rehabilitation Act applies to state prisons and prisoners is somewhat unclear, because the court did not elaborate on why the Federal Bureau of Prisons does not "fit the definition of 'programs or activities.' " The explanation could be that federal entities are not subject to the Rehabilitation Act, or that prisons do not sponsor "programs or activities," see supra pp. 1346-47. If the former understanding is correct, Williams is not necessarily inconsistent with Bonner; the latter explanation, however, would bring the two cases into direct conflict and thus refute Torcasio's claim that courts have spoken with one voice on the applicability of the Rehabilitation Act to state prisoners.
 
 
 42
 We believe the latter interpretation of Williams is the more natural. The Rehabilitation Act applies not only to "any [state] program or activity receiving Federal financial assistance," but also to "any program or activity conducted by any Executive agency." 29 U.S.C. Sec. 794(a). That the Bureau of Prisons is a federal entity therefore would not likely have been the grounds for excluding it from the reach of the Rehabilitation Act. We thus do not understand Williams as turning on the federal/state distinction, but rather as ruling broadly that prisons of whatever jurisdiction are not subject to the Rehabilitation Act because they do not sponsor "programs or activities" as those terms are defined in the Rehabilitation Act. Accord Haston v. Tatham, 842 F.Supp. 483, 487 (D. Utah 1994) ("[I]t is doubtful that the ADA applies in the case of a disabled [state] prisoner who seeks prison employment." (citing Williams )). In any event, the fact that Williams can plausibly be read as holding that the Rehabilitation Act is inapplicable to prisoners generally, including state prisoners, significantly undermines the claim that it was "clearly established" that the Act applied to state prisoners.
 
 
 43
 The conflict between the Ninth and Tenth Circuits on the applicability of the Rehabilitation Act to prisoners is enough to disprove Torcasio's claim that courts have ruled "consistently" on the question, and enough to show as erroneous the district court's conclusion that it was "clear" that the act applied to state prisons. The caselaw simply provides no support for the claim that it was clearly established that the Rehabilitation Act governed state prisons.
 
 3.
 
 44
 Torcasio's claim that various federal regulations reveal that the applicability of the acts to state prisons was clearly established is equally unpersuasive. For example, Torcasio observes that 28 C.F.R. Sec. 42.503(f), a regulation promulgated by the Department of Justice under the Rehabilitation Act, "ha[s] been found to apply to correctional facilities receiving federal financial assistance," and he thus suggests that the regulation clearly brings state prisons within the coverage of the Rehabilitation Act. Appellee's Br. at 22 (citing Bonner, 857 F.2d at 562). In fact, 28 C.F.R. Sec. 42.503(f) does not even mention state prisons, much less establish that they are subject to the act.[8] The regulation that specifies the entities which are subject to 28 C.F.R. Sec. 42.503(f) and other Department of Justice Rehabilitation Act regulations provides no more guidance, as it states simply that the regulations apply "to each recipient of Federal financial assistance from the Department of Justice and to each program receiving or benefiting from such assistance." 28 C.F.R. Sec. 42.502. The regulations therefore define the reach of the Rehabilitation Act using the same broad language as does the Act itself; as we stated above, this broad language is insufficient to clearly establish that the Act applies to state prisons. Torcasio makes much of the fact that the Ninth Circuit in Bonner found 28 C.F.R. Sec. 42.503(f) applicable to state correctional facilities receiving federal financial assistance, see Bonner, 857 F.2d at 562, but for his argument to succeed he must show that the regulation itself speaks clearly on this point, which he cannot.
 
 
 45
 With respect to the ADA, Torcasio points not to final regulations promulgated by the Department of Justice, but rather to the Americans With Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG), which have been developed by the Architectural and Transportation Barriers Compliance Board (ATBCB). See 36 C.F.R. Pt. 1191 App. A; 59 Fed.Reg. 31,676 (1994). The ADAAG clearly contemplate the application of the ADA to state prisons, as the guidelines subject "detention and correctional facilities" to various general accessibility requirements, see 36 C.F.R. Pt. 1191 App. A at 12.1, as well as to a number of correctional-facility-specific requirements, see, e.g., id. at 12.5.2(3) ("Beds shall have maneuvering space at least 36 in (915 mm) wide along one side."). Nonetheless, the guidelines do not show that the applicability of the ADA to state prisons was clearly established at the time Torcasio was in prison in Virginia.
 
 
 46
 First, and most importantly, the guidelines pertaining to detention and correctional facilities did not become effective until December 20, 1994, some six months after Torcasio was paroled. See 59 Fed.Reg. 31,676. Thus, while the guidelines may provide some evidence that it is now established that the ADA applies to state prisons, they are of no help to a claim that this applicability was clearly established at the time of the alleged violations in this case. Indeed, until the publication in June 1994 in the Federal Register of the proposed guidelines applicable to prisons, the ADAAG--which had been in effect since their adoption by the Department of Justice in the form of final regulations on July 26, 1991--did not mention state prisons in either the generally-applicable specifications or in the list of requirements applicable to particular types of buildings and facilities covered by the ADA. During the time Torcasio was incarcerated, therefore, VDOC officials looking to the applicable regulations would not have found any provisions dealing specifically with state prisons, and thus could reasonably have been expected to conclude that they were not covered by the Act.[9]
 
 
 47
 The second shortcoming of Torcasio's reliance on the ADAAG is that the Department of Justice, and not the ATBCB, retains responsibility for issuing final regulations implementing Title II of the ADA. See 42 U.S.C. Sec. 12134. While the final regulations of the Department of Justice are to be consistent with the ADAAG, until such time as those final regulations are promulgated, the ADAAG remain purely advisory.[10] Finally, we note that Torcasio is undermining his own claim by invoking the ADAAG, because these guidelines apply only to "newly designed or newly constructed buildings and facilities and altered portions[11] of existing buildings and facilities." 35 C.F.R. Pt. 1191 App. A at 4.1.1 (emphasis added). To the extent that they define a state prison's obligations under the ADA, therefore, the ADAAG suggest that Keen Mountain was under no obligation to grant Torcasio's proposed modifications, because Torcasio has not alleged that Keen Mountain was newly constructed, newly designed, or altered during his incarceration. Were we to get beyond the qualified immunity inquiry, then, the very regulations on which Torcasio relied to overcome the qualified immunity bar would prove to be his undoing on the merits of his ADA claim. See also 59 Fed.Reg. 31709 (comment on proposed guideline) ("The specifications for toilet rooms in ADAAG 4.22 and for bathing facilities in ADAAG 4.23 include requirements for grab bars at toilets, showers, and tubs. In the prison environment, such elements must be properly secured so that they cannot be removed and used as weapons."); id. at 31703 (comment on proposed guideline) ("A few commenters stated that while grab bars are easy to secure in new construction, to do so as an alteration or retrofit may necessitate reconstruction of cell walls.").
 
 C.
 
 48
 For the foregoing reasons, we conclude that, although the ADA and the Rehabilitation Act were both in effect at the time of the alleged violations, it was not then clearly established that either statute applied to state prisons. We suspect that the district court reached the opposite, erroneous conclusion because of the order in which the court addressed the defenses raised by the VDOC officials. Rather than begin with the prison officials' claim that they were entitled to qualified immunity because the applicability of the acts to state prisons was not clearly established, the court first considered their defense that the acts do not apply to state prisoners. In a recent decision of this court, we reminded district courts that they are to consider as a threshold matter whether officials in a given case are entitled to qualified immunity, and move on to other issues only after concluding that the officials are not. See DiMeglio, 45 F.3d at 797 ("[I]n deciding qualified immunity claims, courts should determine whether the plaintiff has alleged the violation of a ... right that was clearly established at the time of the defendant's actions, before they proceed to address ancillary issues.") (citing Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). This case illustrates the dangers of not adhering to this analytical sequence, for we cannot help but suspect that the court's conclusion that it was clearly established that the acts applied to prisons was heavily influenced by its earlier conclusion that the acts today apply to prisons.[12]III.
 
 
 49
 The district court's ruling that "a morbidly obese inmate's right to the modification of specific [prison] services and facilities" was clearly established while Torcasio was imprisoned at Keen Mountain suffers from a second defect, namely, the erroneous assumption that it was clearly established that obese individuals such as Torcasio qualify as "individuals with disabilities" entitled to the protections of the ADA and Rehabilitation Act. The court never addressed this essential issue, presumably because VDOC officials in their motion for summary judgment "concede[d] that plaintiff's condition of morbid obesity, or at least some of his physical impairments resulting from his obesity, qualify him as a handicapped person within the meaning of the Rehabilitation Act and the ADA." J.A. at 287. Once again, however, there is an important distinction between the question of whether the acts apply to obese individuals, and the question of whether it was clearly established that the acts apply to obese individuals. The prison officials' concession on the first question is not tantamount to a concession on the second,[13] and we therefore must confront the question whether it was clearly established while Torcasio was in prison that, as an obese individual, he was entitled to the protections of the Rehabilitation Act and the ADA. We find that neither the statutes, nor the caselaw, nor the applicable regulations clearly establish that the ADA or the Rehabilitation Act apply to the obese.[14]
 
 
 50
 Torcasio wisely does not contend that the statutes themselves indicate that they apply to the obese. The ADA defines "disability" simply as "with respect to an individual[15]--a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. Sec. 12102(2)(A). The Rehabilitation Act employs a virtually identical, and equally unilluminating, definition. See 29 U.S.C. Sec. 706(8)(B)(i) ("[T]he term 'individual with a disability' means ... any person who ... has a physical or mental impairment which substantially limits one or more of such person's major life activities.").[16]
 
 
 51
 The acts themselves do not define "physical or mental impairment" or "major life activity," instead leaving that task to the applicable regulations. These regulations, in turn, provide little additional guidance. The Department of Justice regulations interpreting the ADA define "physical or mental impairment" as
 
 
 52
 [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.
 
 
 53
 . . . . .The phrase physical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.
 
 
 54
 28 C.F.R. Sec. 35.104; see also 29 C.F.R. Sec. 1630.2(h) (ADA regulations promulgated by EEOC) (substantially same definition); 34 C.F.R. Sec. 104.3(j)(2)(i) (Rehabilitation Act regulations) (substantially same definition). The regulations thus do not clearly establish that an obese individual is covered by the acts.
 
 
 55
 As he did in attempting to show that the applicability of the acts to state prisons was clearly established, Torcasio contends that the caselaw supports his position. Once again, however, we are unpersuaded by his claim. Three of the five cases he cites interpret state anti-discrimination laws, rather than the ADA or the Rehabilitation Act, and thus cannot provide evidence that the federal statutes clearly apply to obese individuals. See Appellee's Br. at 30-31 (citing Krein v. Marian Manor Nursing Home, 415 N.W.2d 793, 796 (N.D.1987) (obesity may constitute disability under North Dakota law); Gimello v. Agency Rent-A-Car, 250 N.J.Super. 338, 594 A.2d 264, 276 (App.Div.1991) (same under New Jersey law); State Div. of Human Rights v. Xerox Corp., 102 A.D.2d 543, 478 N.Y.S.2d 982, 985-86 (1984) (gross obesity may be disability under New York Human Rights Law), aff'd, 65 N.Y.2d 213, 491 N.Y.S.2d 106, 480 N.E.2d 695 (1985)).
 
 
 56
 Turning to the cases that actually interpret federal law, we find some support for Torcasio's argument, but not enough to permit a conclusion that the applicability of the laws to the obese was clearly established. As an initial matter, Torcasio concedes that both of the federal law cases he cites--Cook v. State of Rhode Island Dept. of Mental Health, 10 F.3d 17 (1st Cir.1993), and Smaw v. Commonwealth of Va. Dept. of State Police, 862 F.Supp. 1469 (E.D.Va.1994)--"post-date the commencement of this lawsuit," Appellee's Br. 32. Smaw, indeed, was issued after Torcasio was paroled. The cases therefore are only of marginal relevance to the question of whether, while Torcasio was at Keen Mountain, it was "clearly established" that a person with Torcasio's condition qualified as an "individual with a disability." Moreover, the holdings of the cases are not particularly helpful to Torcasio: the First Circuit in Cook merely affirmed a jury's determination that the particular obese plaintiff in that case qualified as a disabled individual under the Rehabilitation Act, while Magistrate Judge Miller in Smaw held that the obese plaintiff in that case "cannot prove that she is 'handicapped' or 'disabled' as required by the Rehabilitation Act and the ADA." Id. at 1475. Smaw observed further that "it remains unclear whether simple obesity falls within the broad sweep of the definition of physical impairment" under the Rehabilitation Act, id. at 1468-69, and, most damagingly for Torcasio, concluded that "[t]he case law and the regulations both point unrelentingly to the conclusion that a claim based on obesity is not likely to succeed under the ADA," id. at 1475 (emphasis added).
 
 
 57
 The only direct authority on the obesity question available at the time of Torcasio's incarceration, other than the statute itself, is a provision in the "interpretative guidance" appendix to EEOC regulations promulgated pursuant to Title I of the ADA. Although of nominal interpretative value, that provision states that "except in rare circumstances, obesity is not considered a disabling impairment." 29 C.F.R. Pt. 1630 App. Sec. 1630.2(j) (emphasis added). While we understand that Torcasio's case might represent one of those "rare circumstances," given that his obesity appears chronic, this regulation nonetheless severely undermines the claim that it was "clearly established" that obesity is a disability under the ADA.
 
 
 58
 Various statements in Torcasio's own brief belie his assertion that the applicability of the acts to the obese was clearly established, see, e.g., Appellee's Br. at 32 ("Based on the case law and relevant regulations, morbid obesity with the consequential physical problems suffered by Torcasio may very well constitute a disability under the ADA, just as it may constitute a handicap under the Rehabilitation Act." (emphasis added)), and our analysis of the statutes, caselaw, and the relevant regulations leads us to conclude that these statements are appropriately equivocal. It simply was not clearly established, at the time of Torcasio's stay at Keen Mountain, that his obesity brought him within the class of individuals protected by the Rehabilitation Act and ADA.
 
 IV.
 
 59
 Finally, even if we were to assume, notwithstanding the above objections, that "a morbidly obese inmate's right to the modification of specific [prison] services and facilities" was clearly established, we would still find the VDOC officials entitled to qualified immunity as to all of Torcasio's claims, because we find that "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).
 
 
 60
 The previously-mentioned principles of deference to state prison officials are equally applicable here. The Supreme Court has observed that "[i]n the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Turner v. Safley, 482 U.S. 78, 90, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987). The court has gone so far as to hold that "even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) (emphasis added) (citing Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); Pell v. Procunier, 417 U.S. 817, 822, 826, 94 S.Ct. 2800, 2804, 2806, 41 L.Ed.2d 495 (1974); Procunier v. Martinez, 416 U.S. 396, 412-14, 94 S.Ct. 1800, 1810-12, 40 L.Ed.2d 224 (1974)). See also Turner, 482 U.S. at 89, 107 S.Ct. at 2261 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." (emphasis added)). Given the leeway prison officials are accorded where their actions threaten constitutional rights of inmates, it follows a fortiori that prison officials enjoy similar flexibility with respect to inmates' statutory rights; in other words, a reasonable official could believe that some accommodations of the disabled that might be required in a public library are not required in prison.
 
 
 61
 Even the Ninth Circuit--which is, as we mentioned earlier, the only circuit to have squarely held that the Rehabilitation Act applies to state prisons--has recognized the force of these principles in addressing "the issue [of] how the Act is to be applied in the prison setting." Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir.1994). Recognizing the deference owed state prison administrators, the court noted that
 
 
 62
 just as constitutional rights of prisoners must be considered in light of the reasonable requirements of effective prison administration, so must statutory rights applicable to the nation's general population be considered in light of effective prison administration. The Act was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the Act to apply to prison facilities irrespective of the reasonable requirements of effective prison administration. It is highly doubtful that Congress intended a more stringent application of the prisoners' statutory rights created by the Act than it would the prisoners' constitutional rights. Thus, we deem the applicable standard for the review of the Act's statutory rights in a prison setting to be equivalent to the review of constitutional rights in a prison setting....
 
 
 63
 Id. at 1447. Thus, even the one circuit that applies the Rehabilitation Act to prisons now refuses to scrutinize a claim brought under the Act any more closely than it would an Eighth Amendment claim; in this circuit, as Taylor recognized, that is a highly deferential standard.[17] In view of this consensus that any rights prisoners enjoy--including the right of disabled inmates to some degree of accommodation--must be assessed in light of the requirements of prison administration, VDOC officials could certainly have reasonably concluded that their actions were consistent with "a morbidly obese inmate's right to the modification of specific [prison] services and facilities."
 
 
 64
 VDOC officials took significant steps to address Torcasio's obesity-related grievances. Upon his arrival at Keen Mountain, prison officials first placed Torcasio in the prison infirmary, which was equipped with most of the disability accommodations Torcasio demanded, including side railings and wide bathroom access. Torcasio v. Murray, 862 F.Supp. 1482, 1486 (E.D.Va.1994). Because inmates housed in the infirmary receive less freedom and fewer privileges than other inmates, however, Torcasio himself requested a transfer into the general population, which was granted. Having granted his request to be moved into the general inmate population, prison officials further accommodated Torcasio's weight and mobility limitations by (1) providing him with a private cell originally designed to house two inmates, (2) removing the existing beds from that cell and installing in their place a full-size hospital bed equipped with railings, (3) providing reinforced chairs for Torcasio to use in both his cell and the dining hall, and (4) installing mats and handrails in the shower area. These attempts to accommodate Torcasio's condition at Keen Mountain were in keeping with the prior practice of VDOC officials, who, in response to Torcasio's complaints during his confinement at other VDOC facilities, had granted him a step into the shower, a handrail in the shower, a free-standing locker as opposed to a foot-locker, and a CPAP device (equipped with a backup power system to allow the machine to continue functioning if the electricity went out) to assist his breathing while he slept. Appellants' Br. at 31. This portfolio of accommodations of course did not satisfy all of Torcasio's requests, but certainly could have been viewed by a reasonable prison administrator as a satisfactory accommodation of whatever right Torcasio had to modification of prison facilities, providing yet another basis for reversal of the district court's partial denial of qualified immunity.
 
 CONCLUSION
 
 65
 The judgment of the district court is affirmed insofar as it granted the appellants' motion for summary judgment on the grounds of qualified immunity, and reversed insofar as it denied that motion. The case is remanded with instructions to dismiss all claims against the appellants.
 
 
 66
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 [1]
 The district court properly interpreted Torcasio's pro se complaint as invoking the ADA and Rehabilitation Act
 
 
 [2]
 The appellants contend that monetary relief is unavailable under the Rehabilitation Act and ADA to remedy discrimination outside of "the employment context." Appellants' Br. at 10-11, 17. The remedies available for ADA violations are those available for Rehabilitation Act violations, and in Pandazides v. Virginia Board of Education, 13 F.3d 823 (4th Cir.1994), we held that "suits under [the Rehabilitation Act] provide the plaintiff a full panoply of legal remedies," including monetary damages. Id. at 832. We see no basis for reading Pandazides as limited to the employment context, as the appellants urge. For purposes of this case, we will assume that monetary damages are available for violations of both acts, because we hold in favor of the appellants on other grounds
 
 
 [3]
 Because we conclude that the VDOC officials were entitled to qualified immunity, we do not address their alternative defenses that the Rehabilitation Act and ADA afford Torcasio no private right of action against prison officials, and that Torcasio lacks standing to sue because he is not in an employment relationship with the appellants. See Appellants' Br. at 8-10, 15-16
 
 
 [4]
 Most courts have been similarly unwilling to extend the protections of the FLSA to prison inmates. See Harker, 990 F.2d at 135 (citing Vanskike v. Peters, 974 F.2d 806, 808 (7th Cir.1992); Miller v. Dukakis, 961 F.2d 7, 8 (1st Cir.1992); Gilbreath, 931 F.2d at 1325-26, 1328-31). We recognize that some of these courts have refused to adopt a per se rule that the FLSA is inapplicable to prisoners, and have instead employed an "economic reality" test, which in theory permits an inmate to qualify as an employee. See, e.g., Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir.1984). However, the fact that some courts have followed this course does not, in our view, cast doubt on our premise that broadly-worded federal statutes are not presumptively applicable to state prisons. The FLSA is more plausibly interpreted as applying to state prisons than are the ADA and the Rehabilitation Act, because it contains a list of particular classes of workers who are not entitled to FLSA protections. See 29 U.S.C. Sec. 213(a) (exempting, inter alia, executives, casual babysitters). This provision supplies some of the specificity lacking from the Rehabilitation Act and ADA, because where Congress has specifically excluded some would-be employees from the scope of a statute, the inference can be drawn that Congress intended the act to cover employees not included in that list. See, e.g., Carter, 735 F.2d at 13 (relying on this expressio unius reasoning)
 
 
 [5]
 Moreover, although the definition of "public entity" contained in Title II of the ADA is a broad one, it is still true that prisons are not expressly mentioned in the statute, and they certainly do not come readily to mind as the type of institution covered. As the Commonwealth puts it,
 It would be one thing to conclude that Congress intended that those areas of state prisons to which the free public has access should be adapted to accommodate the handicapped. It is an altogether different conclusion to determine that Congress intended Title II of the ADA to apply inside a prison's living areas.
 Appellants' Reply Br. at 11 n. 10. Even the name ascribed to Title II--"Public Services"--connotes a ban on discrimination in services provided to the public, not in the prison context where the public is excluded. State prisons thus do not fit neatly within the definition of "public entities" to which the ADA applies.
 
 
 [6]
 The court also rejected the defendants' qualified immunity defense, which apparently also was based on the argument that the ADA was not in effect at the relevant time. Noland, 835 F.Supp. at 488
 
 
 [7]
 Notably, the Ninth Circuit recently retreated from its holding in Bonner that the Rehabilitation Act applies to state prisons. In Gates v. Rowland, 39 F.3d 1439, 1446-47 (9th Cir.1994), the court considered "how the Act is to be applied in a prison setting," and observed, "[t]he Act was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the Act to apply to prison facilities irrespective of the reasonable requirements of effective prison administration." Thus, the court held that "the applicable standard for the review of the Act's statutory rights in a prison setting [is] equivalent to [the standard for] the review of constitutional rights in a prison setting." Id. at 1447. Although Gates postdates the period of Torcasio's incarceration, and thus is not directly relevant to the question of whether the applicability of the Rehabilitation Act to state prisons was clearly established at the time of the events at issue in this case, we consider Gates to be an indication that the Ninth Circuit is beginning to rethink its decision in Bonner that state prisons are subject to the requirements of the Rehabilitation Act
 
 
 [8]
 28 C.F.R. Sec. 42.503(f) states simply that "[a] recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program receiving Federal financial assistance. Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices. Attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature are not required under this section. Departmental officials may require recipients employing fewer than fifteen persons to provide auxiliary aids when this would not significantly impair the ability of the recipient to provide its benefits or services."
 
 
 [9]
 Torcasio protests that the effective date of the ADAAG is immaterial. He argues that the very fact that the ATBCB was conducting a rulemaking, complete with comments from concerned prison officials, while Torcasio was imprisoned attests to a general understanding that the ADA would apply to state prisons. We reject this claim, because the "clearly established" inquiry is an objective inquiry, and does not turn on what the ATBCB and various prison officials responding to a notice of proposed rulemaking might believe to be the reach of the ADA. The ATBCB and the prison officials who responded to the notice of proposed rulemaking might be insufficiently attuned to the considerations of federalism implicated by a proposal to apply the ADA to state prisons. See J.A. at 286 (Appellants' motion for summary judgment) ("Even if one were to assume that the [ADAAG] would ultimately result in a final published rule, the defendants would then contend that such a rule is arbitrary, capricious and an abuse of discretion, or otherwise not in accordance with law.")
 
 
 [10]
 The Department of Justice has published a notice of proposed rulemaking seeking public comments on the proposal to incorporate into regulations the ADAAG provisions dealing with correctional facilities, but apparently has not acted further in this regard
 
 
 [11]
 "Alteration" is defined in the ADAAG as "a change to a building or facility ... that affects or could affect the usability of the building or facility or part thereof. Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, resurfacing, changes or rearrangement of the structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions.... Normal maintenance, reroofing, painting or wallpapering, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility." 36 C.F.R. Pt. 1191 App. A at 3.5
 
 
 [12]
 Because we find that the applicability of the acts to prisons was not clearly established at the time in question, it follows a fortiori that the more specific right of prisoners to the particular accommodations requested by Torcasio was likewise not clearly established. As even the district court noted, "the extent of an institution's affirmative duties to accommodate an individual with [Torcasio's] disability was not clearly defined," Torcasio, 862 F.Supp. at 1493, and "[n]o United States Court of Appeals has provided guidance on what might constitute reasonable accommodation of a morbidly obese inmate," id. at 1493 n. 10. Putting aside for the moment the district court's erroneous conclusion that it was clearly established that the acts applied to state prisons, these observations alone should have led the court to grant qualified immunity on all claims, because, as we have repeatedly noted, the Supreme Court has directed courts to focus on the right alleged at a very specific level when deciding questions of qualified immunity. See, e.g., DiMeglio, 45 F.3d at 803 (citing, inter alia, Anderson v. Creighton, 483 U.S. 635, 639-41, 107 S.Ct. 3034, 3038-40, 97 L.Ed.2d 523 (1987))
 
 
 [13]
 Indeed, the VDOC officials contend strenuously here that it was not clearly established that the acts apply to obese individuals. See Appellants' Br. at 21-23
 
 
 [14]
 Torcasio also claims that "whether [his] obesity constitutes a disability under the ADA is necessarily a question for the trier of fact to decide, and it would have been improper to resolve that issue on motion for summary judgment." Appellee's Br. at 28. The question before us, of course, is not whether Torcasio's obesity in fact constitutes a disability, but whether it was clearly established that his obesity amounts to a disability. This latter question is a question for the court to resolve. See DiMeglio, 45 F.3d at 795 ("[B]ecause the question of immunity is essentially a legal question, '[i]mmunity should ordinarily be decided by the court long before trial.' " (citations omitted))
 
 
 [15]
 Given that both the ADA, see Ennis v. Nat'l Assoc. of Bus. and Educ. Radio, Inc., 53 F.3d 55 (4th Cir.1995), and the Rehabilitation Act, see Forrisi v. Bowen, 794 F.2d 931, 933 (4th Cir.1986), contemplate individualized assessments of whether a person qualifies as an "individual with a disability," a plaintiff will often have difficulty showing that it was "clearly established" that his particular condition brought him within the coverage of either act
 
 
 [16]
 Both acts also consider an individual to be disabled if he (a) has a record of an impairment that substantially limits one or more of his major life activities, or (b) is regarded as having such an impairment. See 42 U.S.C. Secs. 12102(2)(B)-(C); 29 U.S.C. Secs. 706(8)(B)(ii)-(iii)
 
 
 [17]
 A panel of this court earlier described Torcasio's complaints as "inconveniences," and ruled that they "do not, objectively, amount to a 'serious deprivation of a basic human need' " that would violate the Eighth Amendment. Torcasio v. Murray, No. 93-6585, 1993 WL 491310, at ** 1 (4th Cir. Nov. 15, 1993) (unpublished) (quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir.1993)). Under the Ninth Circuit's standard in Gates, therefore, Torcasio's claim that his ADA and Rehabilitation Act rights were violated would lose on the merits