Vivian MORROW, Plaintiff,

v.

CITY OF JACKSONVILLE, ARKANSAS; Larry Hibbs, Individually and in his Official Capacity as Chief of Police; and Don Tate, Individually and in his Capacity as former Chief of Police; Defendants.

No. LR–C–94–591.

United States District Court, E.D. Arkansas, Western Division.

Feb. 16, 1996.

Phil W. Campbell, North Little Rock, AR, for plaintiff.

Mark Robert Hayes, Beni Shane Perry, Jeanette L. Hamilton, North Little Rock, AR, Robert E. Bamburg, Jacksonville, AR, for defendants.

## ORDER

ROY, District Judge.

Now before the Court is the defendants' motion to dismiss or in the alternative, for summary judgment [DOC # 19]. For the reasons set out below, the motions are granted in part and denied in part.

### I. Facts

Many of the most important facts in this case are not seriously disputed. Accordingly, only a brief summary is set out herein.

The plaintiff was 59 years old at the time she filed this suit in September of 1994. At all times pertinent, she has been a resident of the City of Jacksonville, Pulaski County, Arkansas, and until her placement on indefinite medical leave, was an employee at the city's police department. The city is an "employer" within the meaning of 42 U.S.C. § 12101 et seq, and has more than 25 employees.

Separate defendant Larry Hibbs is the current chief of police in Jacksonville. Separate defendant Don Tate is the former Jacksonville chief of police.

Ms. Morrow went to work for the police department in October of 1978. She worked as a patrolman before becoming a Juvenile Officer in 1988. Her principal duty in the latter position was interviewing people in connection with child abuse, runaways, and juvenile cases. These interviews were almost always conducted in her office. She occasionally worked outside her office to attend court, meet agency people connected with her work, attend training classes, and other miscellaneous duties.

Prior to 1993, the police department's physical fitness standards for employees over 50 were less rigorous than those for the other officers. The plaintiff was required to walk three miles with no time limit and had to perform a certain number of sit-ups and leg lifts. The plaintiff always passed these tests. During this time the plaintiff was performing her duties as Juvenile Officer satisfactorily.

In early 1993 the police department adopted an "Essential Functions Awareness Program," possibly in response to the implementation of the Americans with Disabilities Act, or "ADA."[1] The most important portion of the program, for this Court's purposes, was the requirement that all current and prospective officers pass an obstacle course test in three minutes or less.

---

1. "Essential function" and "essential job function" are terms of art in the ADA.

The plaintiff failed in all three of her attempts to pass the test. After the first failure, she was warned that she would be disciplined or fired if she did not pass the test by July 5, 1993. On that date she failed the test again and failed it the third time on July 19, 1993. That same day she was notified by defendant Tate, who was the Chief at that time, that she was immediately suspended thirty days without pay and would be fired unless she passed the test on August 18.

On July 27 she filed the first of two Charges of Discrimination with the EEOC. She was then told by Chief Tate to return from her suspension on August 30. When she did so, she was not allowed to perform her former duties. Instead, she was assigned to radio dispatching and ordered to report to the Department's doctor. He found her to be "markedly obese" and suffering from hypertension. He recommended that she not be retested for six months so that she could lose some weight.

Late that year or early in 1994, plaintiff was again reassigned, this time to clerical duties. It is not disputed that she did her job well.

In April, 1994, the plaintiff was due to take the test again. The Department doctor again examined her and recommended that she not take the test on account of her health. Separate defendant Hibbs, who was by then the acting chief of police, then suggested she see her personal physician. On April 25, 1994, her doctor reported that it would be unwarranted to expose the plaintiff to the physical demands of the test and suggested that she either be excused from taking the test or that the test be modified. Two days later the plaintiff was informed by Chief Hibbs that she was being placed on indefinite sick leave until she could pass the Essential Functions test. She has not worked for them since that time. On May 11, 1994, she filed her second Charge with the EEOC relating to this incident.

## II. Claims

Plaintiff brings related claims under several civil rights statutes. In Count I of her complaint she asserts that the adverse employment actions taken against her were in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark.Code Ann. § 16–123–101 et seq. In Count II she alleges disparate treatment vis-a-vis similarly situated male officers, along with retaliation on account of her 1984 discrimination claim against the City, both in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., as well as the ACRA. In Count III she alleges discrimination based on age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., together with the ACRA. Because she works for a public employer, she has also brought corresponding claims under 42 U.S.C. § 1983. In addition to suing the City, she has sued Tate and Hibbs in both their official and individual capacities.

In support of the motion before the Court, the defendants have argued that they are entitled to summary judgment on some of plaintiff's claims and that the others should be dismissed as a matter of law.

### A. Title VII, ADA, ADEA, and ACRA claims against Hibbs and Tate in their individual capacities

The defendants argue that separate defendants Hibbs and Tate cannot be sued in their individual capacities in a Title VII action, nor one brought pursuant to either the ADA or the ADEA. Though the plaintiff correctly points out that at one time there was a split among the circuits on this issue, that is no longer the case. "Whatever the law in these jurisdictions may have been at one time, the more recent cases reflect a clear consensus on the issue before us: supervisors and other employees cannot be held liable under Title VII in their individual capacities." Lenhardt v. Basic Institute of Technology, Inc., 55 F.3d 377, 381 (8th Cir. 1995).

In Lenhardt, the Eighth Circuit was required to predict how the Missouri Supreme Court would decide this same issue in a case involving not Title VII, but the Missouri Human Rights Act. The Missouri Supreme

Court had considered analogous provisions in federal civil rights laws when interpreting the MHRA in the past. Thus, in *Lenhardt*, the Eighth Circuit surveyed federal case law to determine if supervisors could be sued in their individual capacities in Title VII and/or ADEA cases. The Court noted that four Courts of Appeals had, at that time, "considered the question of a supervisor's individual liability and uniformly have held that an employee-supervisor cannot be sued in his or her individual capacity under the statute." *Id.*, at 380. *See Birkbeck v. Marvel Lighting Co.*, 30 F.3d 507, 510–11 (4th Cir.) (ADEA case), *cert. denied*, —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994); *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.) (Title VII) *cert. denied*, —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Miller v. Maxwell's International Inc.*, 991 F.2d 583, 587 (9th Cir.1993), *cert denied* 510 U.S. 1109, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Lankford v. City of Hobart*, 27 F.3d 477, 480 (10th Cir.1994). The Eighth Circuit concluded that the Missouri Supreme Court would consider those cases and hold that employees, including supervisors or managers, are not subject to individual liability.

Since *Lenhardt* was decided, other Courts of Appeals have taken up the issue. Just six days later the Seventh Circuit, in an ADA case, held that an individual who does not meet the ADA's definition of "employer" cannot be held liable under the ADA. *EEOC v. AIC Security Investigations, Ltd.*, 55 F.3d 1276 (7th Cir.1995). In December of 1995, the Seventh Circuit extended the reasoning of *AIC Security* to cover Title VII cases in *Williams v. Banning*, 72 F.3d 552 (7th Cir. 1995). Those cases are consistent with the Second Circuit's recent decision in *Tomka v. Seiler Corp.*, 66 F.3d 1295 (1995) (Title VII),

the D.C. Circuit's decision in *Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.) (Title VII), *cert. denied*, —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995), and *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir.1995) (Title VII).

Given the Eighth Circuit's analysis in *Lenhardt*, together with the near unanimity of opinion on this issue among the Courts of Appeals, this Court will follow the prevailing view and dismiss plaintiff's Title VII, ADA, and ADEA claims against defendants Hibbs and Tate in their individual capacities. This action is consistent with the decision of Judge Eisle (of this District) in *Grissom v. Waterloo Industries, Inc.*, 902 F.Supp. 867, 870 (E.D.Ark.1995).

■ With regard to the companion ACRA claims brought against defendants Hibbs and Tate individually, they should be dismissed as well, though for different reasons: 1) her supervisors do not fit the definition of an "employer" found at A.C.A. 16–123–102(5) relating to employment discrimination covered under 16–123–105 & –107; and 2) her rights the defendants allegedly violated are not covered by the Arkansas Constitution and thus 16–123–103 is not implicated.[2]

### B. Count I—Disability discrimination (ADA and ACRA)

■ The defendants argue that they are entitled to summary judgment on plaintiff's claims that defendants violated her rights under the Americans with Disabilities Act. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

---

**2.** The ACRA divides the rights and remedies protected by that Act into three broad categories: 1) the deprivation of any "rights, privileges, or immunities secured by the Arkansas Constitution" by an governmental entity or a person acting under color of state law (Ark.Code Ann. 16–123–103);

2) "hate crimes" as more fully described in A.C.A. 16–123–104; and
3) several types of discrimination as more fully set out in A.C.A. 16–123–105.

More specifically, defendants make three main arguments: (1) Ms. Morrow is not a "qualified individual with a disability" ("QID") as defined by the act because she is not **"able to meet *all* of a program's requirements in spite of [her] handicap."** (emphasis in defendant's brief); (2) her employer has already made reasonable accommodations for her; and, (3) any further "accommodating" would pose an "undue hardship" on the city and/or would pose a safety threat to others.

Is the plaintiff a "qualified individual with a disability?" The Act defines a QID as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the *essential functions of the employment position* that such individual holds or desires. For the purposes of this title, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8) (emphasis added).

The briefs of the parties on this point have focused on whether the plaintiff can perform the essential functions of the job and whether the City's list of those essential functions is controlling. The Court will address a more fundamental issue: whether the plaintiff even has a "disability" within the meaning of the statute. This has recently been described as a "threshold burden" an ADA claimant must meet. *Roth v. Lutheran Gen. Hospital*, 57 F.3d 1446, 1454 (7th Cir.1995).

The ADA defines "disability" as follows:

> (2) Disability. The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or

(C) being regarded as having such an impairment.

Title 42 U.S.C. § 12102(2).

Plaintiff does not dispute that she is obese and fails to meet the City's weight guidelines. In fact, she claims her obesity is what triggers the ADA's protections. However, after reviewing the cases, the Court concludes that there is scant authority anywhere, and none from the Eighth Circuit, for the proposition that obesity is a disability *per se*. Rather, the weight of authority holds to the contrary. *See, e.g., Torcasio v. Murray*, 57 F.3d 1340, 1354 (4th Cir.1995) (reviewing recent case law finding obesity not a disability under the ADA); *Nedder v. Rivier College*, 908 F.Supp. 66, 77–79 (D.N.H.1995); *Smaw v. Com. of Virginia Dept. of State Police*, 862 F.Supp. 1469, 1475 (E.D.Va.1994) ("The case law and the regulations both point unrelentingly to the conclusion that a claim based on obesity is not likely to succeed under the ADA."); 29 C.F.R. pt. 1630 App., § 1630.2(j) ("except in rare circumstances, obesity is not considered a disabling impairment.").

In none of these cases was the plaintiff's weight found to "substantially" limit a "major life activit[y] of such individual." There is no disputing that "working" is a major life activity. However, regulations implementing the ADA include the statement that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Most caselaw is in accord.

For example, in a case decided under the substantially similar Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir.1986), the Fourth Circuit wrote: "an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job." *Id.*, at 934. Similarly, the Sixth Circuit has written "an impairment that interfered with an individual's ability to do a particular job, but did not significantly decrease that individual's ability to obtain satisfactory employment otherwise, was not *substantially* limited within the meaning of the statute." *Jasany v. United States Postal Service*, 755 F.2d 1244, 1248 (6th Cir.1985)

(cited with approval by *Welsh v. Tulsa*, 977 F.2d 1415, 1418 (10th Cir.1992)).

Two other cases along this vein which involve unsuccessful applicants for police officer positions are interesting. In *Daley v. Koch*, 892 F.2d 212 (2d Cir.1989), an applicant was rejected based on the results of his psychological profile. He argued to the court that being declared unsuitable to work as a police officer was a substantial limitation on a major life activity. The Second Circuit wrote:

> the regulations cannot be interpreted to extend this definition to include working at the specific job of one's choice. The position of New York City police officer demands unique qualifications that appellant has failed to meet. *Being declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity.*

*Daley*, 892 F.2d at 215 (internal citation omitted) (emphasis added).

In *Joyce v. Suffolk County*, 911 F.Supp. 92 (E.D.N.Y.1996), an applicant was rejected on account of his sub-standard uncorrected vision. The court in *Joyce* focused on the unique skills required of police officers and found, as the Second Circuit had in *Daley*, that the failure to be hired as a policeman did not constitute a "significant" limitation of a major life activity.

> Police officers are often forced to make split second judgments, under circumstances that are tense, uncertain, dangerous and rapidly evolving. An officer faces situations as a matter of course in which his own safety as well as the safety of other officers and the public may depend on his visual acuity.

\* \* \* \* \* \*

In the Court's view, the police department has every right to require that its new recruits be in optimal physical condition.

*Joyce*, 911 F.Supp. at 97.

Ms. Morrow directs the Court's attention to the case of *Cook v. Rhode Island*, 10 F.3d 17 (1st Cir.1993), where the First Circuit found that a woman with the condition of "morbid obesity" was rejected for the position of residential care facility attendant on the basis of a perceived "substantial impairment." The Court found that evidence introduced at trial could have permitted a jury to reasonably find that the plaintiff's employer regarded plaintiff's condition as foreclosing for her "a broad range of employment options in the health care industry." *Id.*, at 25. That, in turn, would amount to the substantial "limiting [of] a major life activity—being able to work." *Id.*

Nevertheless, this Court believes that the facts and holding in *Cook* are distinguishable from cases where the job sought required more specialized job skills. The *Cook* court itself agreed:

> We think there is a significant legal distinction between rejection based on a job-specific perception that the applicant is unable to excel at a narrow trade and a rejection based on more generalized perception that the applicant is impaired in such a way as would bar her from a large class of jobs.

*Cook*, 10 F.3d at 26.

Turning to the case at hand, this Court finds that the current record is virtually devoid of any evidence that Ms. Morrows' impairments, a combination of obesity and hypertension, have significantly limited any major life activity, such as "working." She states in her pleadings that her job duties "as a Juvenile Officer were not physically strenuous." *Plaintiff's Memorandum in Opposition*, at 5. Her doctor reported that she was "capable of performing her regular duties at this time but should not participate in the physical testing requirement." *Id.* at 14. In plaintiff's affidavit dated July 27, 1995, she reiterates that her Juvenile Officer duties were not physically strenuous and that she performed them satisfactorily. *Affidavit* at 1. At the age of 50, she was able to meet a requirement in force at that time to walk 3 miles and perform 20 leg lifts and 10 sit ups. *Id.* at 2. In 1993 and/or 1994 her duties were changed to traditional office work, including filing, which she handled satisfactorily. *Id.* at 4. She even states that "[a]t all relevant times, I have been physically able to make forceful arrests and to han-

dle firearms effectively and safely." *Id.* at 6, ¶ 23.

While there is no doubt that there are some jobs that Ms. Morrow can not do, there is little evidence in the record suggesting that she is so physically impaired that she is barred from a large class of jobs, either in number or in type. Nevertheless, the Court notes that the "threshold" issue of whether the plaintiff is even disabled was barely addressed by either side.

In their summary judgment motion the defendants assumed, without conceding, that the plaintiff's obesity constituted a disability within the meaning of the ADA. In her response, the plaintiff cited one case in her favor in a footnote. Neither side devoted much energy on the issue.[3] Neither side addressed at all the question of whether this was a question for the jury.

After a careful reading of the cases, the Court concludes that whether the plaintiff's weight "*substantially* limits" her life activity of "working" is a question of fact for the jury.[4]

This decision is bolstered by considerations of fairness. First, though the defendants did not concede the argument as to plaintiff's disability, they did not pursue it their motion and brief. It would indeed be quite a burden on a party responding to a summary judgment motion to respond not only to the issues argued by the movant, but also to the issues the movant *could have* argued. Second, it seems contrary to the spirit of the ADA for the Court to bar the plaintiff's claim by summary judgment because the Court seized on an issue both her counsel and opposing counsel did not.

Therefore, this portion of the summary judgment motion is denied. Similarly, the Court finds that whether her impairment qualifies as a disability as defined by A.C.A. 16–123–102(3) is also a question of fact.

**3.** This is not to find fault with counsel. The cases suggest that it is the rare case when the matter of whether an individual has a disability is even disputed.

## C. Count III—Age Discrimination (ADEA)

The defendants argue that they are entitled to summary judgment on plaintiff's claim that she was discriminated against on account of her age. She offers two theories: disparate impact and disparate treatment.

### 1. Disparate impact

It bears noting that there is a serious question as to whether the Supreme Court believes that a disparate *impact* theory is even available under the ADEA. The Court has made it clear that it has never recognized that such a theory is available. "[W]e have never decided whether a disparate impact theory of liability is available under the ADEA, and we need not do so here." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

> [N]othing in the Court's opinion should be read as incorporating in the ADEA context the so-called "disparate impact" theory of Title VII.... As the Court acknowledges ... we have not yet addressed the question whether such a claim is cognizable under the ADEA, and there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA.

*Id.,* 507 U.S. at 618, 113 S.Ct. at 1710 (Kennedy, J., concurring, joined by The Chief Justice and Thomas, J.)

It is certainly fair to say that a strong line of cases is emerging suggesting that an ADEA plaintiff cannot bring a impact theory. *See e.g., EEOC v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994) ("decisions based on criteria which merely tend to affect workers over the age of forty more adversely than workers under forty are not prohibited"); *Ellis v. United Airlines,* 73 F.3d 999, 1007 (10th Cir.1996); ("we now answer that question and hold that disparate impact claims are not cognizable under the ADEA"); *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 1004–05 (5th Cir.1996) (en banc) (DeMoss, J.,

**4.** The Court also notes that no other major life activity has been even suggested by the plaintiff as having been limited.

concurring in part and dissenting in part) (discussing differences in the standards applicable under Title VII and ADEA; "By contrast, *Hazen Paper* indicates that disparate impact theory is not available under ADEA.")

However, in the "post-Hazen Paper" ADEA cases taken up by our Eighth Circuit, this Court finds any mention of the issue conspicuously absent. Certainly, there has been no explicit holding that disparate impact claims under ADEA are no longer allowed. In fact, implicit in the Eighth Circuit's recent ADEA cases is the idea that the theory survives. *See, Pulla v. Amoco Oil,* 72 F.3d 648 (8th Cir.1995); [5] *Houghton v. SIPCO,* 38 F.3d 953 (8th Cir.1994) (new trial granted on plaintiff's disparate impact theory; all cited cases predate *Hazen Paper*); *Brown v. Stites Concrete,* 994 F.2d 553, 558 n. 3 (8th Cir.1993) (en banc) (quoting from *Hazen Paper* that the Supreme Court has never decided whether a disparate impact theory is available). Accordingly, the Court will take up the plaintiff's disparate impact theory.

Part of what the plaintiff must show to establish a *prima facie* case is that the challenged employment practice, in this case running the obstacle course in three minutes or less, though neutral on its face, has a significant adverse effect on persons in the protected class, i.e., over 40. The Court's examination of the offered statistical evidence does not support such a conclusion.

From the time taking the test became mandatory, until May 9, 1994 (plaintiff filed her last EEOC charge on May 11, 1994), 67 individuals attempted the test.[6] Of those 67, 26 were over 40 years old on at least one of their test attempts. None of the officers

under 40 flunked the test. Of the other 26, only two people failed to pass after three attempts: the plaintiff and a Rudy Bouwknegt (male, age 52–53). In other words 92.3% of those in the protected class passed the test. Even if one counts Lt. Reshel as one who took the test and did not pass, the "pass" rate only drops to 88.9%. The Court does not find that this demonstrates a significant adverse effect on those protected by the ADEA.

The plaintiff urges the Court to only consider those over 50 when taking the test. Without commenting on whether using this more narrow age group is proper under the law, the Court will simply say that to do so makes no difference. One reason is that the size of the resulting pool would be so small as to be of questionable help statistically. Only eight test takers were over 50 when they took the test. Furthermore, the people in that age group fared very well on the test: six out of the eight passed—only Ms. Morrow and Sgt. Bouwknegt failed. Furthermore, even Sgt. Bouwknegt would have passed on his second attempt—he completed the course in 2:58—but he only hit 3 of 6 pistol targets instead of the requisite four. That is how close the plaintiff came to being the *only* person of the sixty-seven to fail the test.

Finally, none of the six over 50 who passed the test had much trouble doing so. The six had a total of fifteen attempts between them and passed all fifteen times. The average passing time for the six was 2:12. Capt. Tolbert and Jailor Hardy had six attempts between them and finished every single one under *two* minutes.

The Court concludes that the plaintiff has not demonstrated that the questioned employment practice, requiring the police offi-

**5.** In *Pulla,* the partially successfully plaintiff cross-appealed the trial court's ruling denying plaintiff's motion during the trial to amend his pleadings to conform with the evidence per Fed. R.Civ.P. 15(b) so that he could submit a disparate impact theory to the jury. The appeals court affirmed on this point, saying the trial court had not abused its discretion. In addressing both the plaintiff's Rule 15(b) and Rule 8 arguments, the Court essentially said that the "impact" and "treatment" theories were so distinct that a defendant was entitled to specific notice of each one.

The *Pulla* decision was filed on December 19, 1995.

**6.** An additional officer, Lt. Reshel, was to have taken the test after its adoption by the civil service commission but was stricken with cancer. He was granted a medical reprieve from taking the test while undergoing treatment for the disease. He eventually took medical retirement before passing away. Ironically, Lt. Reshel helped develop the test and passed it before it was formally adopted by the civil service commission.

cers to pass the skills test in three minutes or less, significantly adversely affects the protected age group. Accordingly, the plaintiff has not made even a *prima facie* case on her disparate impact case.

### 2. Disparate treatment

■ To establish a *prima facie* case of "disparate treatment" age discrimination a plaintiff must show that "he was within the protected age group, that he was performing his job at a level that met his employer's legitimate expectations, that he was discharged, and that his employer attempted to replace him." *Nelson v. J.C. Penney Co.,* 75 F.3d 343, 345 (8th Cir.1996); quoting *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993). In the matter *sub judice,* Ms. Morrow has shown that she is over 40 and therefore is in a protected class, she was doing her job as a Juvenile Officer in a satisfactory manner, that she was put on indefinite sick leave without pay, and that her position was filled by her 30 year old female assistant. Because the Court believes that forbidding her from returning to work unless and until she passed the Essential Functions test should be considered a constructive discharge of the plaintiff, the Court finds that she has made her *prima facie* case.

■ "To rebut a presumption of unlawful age discrimination created by a plaintiff's *prima facie* case, an employer has to offer reasons for its actions that, if believed by a jury, would allow the jury to conclude that the plaintiff's age was not the reason for his termination." *Id.* Here, the City has clearly done so, pointing to its neutral-on-its-face performance standard which, it argues, is rationally related to its goal of having a police force able to undertake its unique duties.

■ Therefore, the Court need only consider whether the plaintiff has presented sufficient evidence "capable of proving that the real reason for [her] [constructive] termination was discrimination based on age." *Id.,* quoting *Nelson v. Boatmen's Bancshares, Inc.,* 26 F.3d 796, 801 (8th Cir.1994). In fact, she has presented precious little.

In Count III of her complaint, the plaintiff does not allege that she and only she was singled out for poor treatment on account of her age. Instead, she suggests that the City was going after everyone in the Department over 50:

The ... City's decision to require police officers age 50 and over to pass the Essential Functions test was ... made for the purpose of providing a pretext to discipline and constructively discharge police officers age 50 and older.... The Defendant's policy *also* has a disparate impact on officers age 50 and older in violation of ADEA....

*Complaint,* at ¶ 36 (emphasis added).

What evidence has the plaintiff identified which could demonstrate that the City's articulated rationale was merely a pretext for constructively discharging the plaintiff?

Age need not be the sole reason for the adverse employment decision; however, "a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in ... [the employer's decisionmaking process] and had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). If age does not motivate the employer's decision, then a "discharge may well be unfair or even unlawful yet not be evidence of age bias under the ADEA." *Moore v. Eli Lilly & Co.,* 990 F.2d 812, 819 (5th Cir.), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

*Rhodes v. Guiberson Oil Tools,* 75 F.3d at 993–94.

In the plaintiff's Response to the defendant's summary judgment motion, she offers five facts in support of her ADEA claim(s), at least two of which can only be said to speak to the disparate *impact* theory. The remaining three are summarized as follows:

1) The physical fitness tests in effect from 1985 to 1990 made allowances for older employees;

2) The only officers who did not pass the test were over 50. (See Part II–C(1) above)

3) The woman who replaced the plaintiff as Juvenile Officer was 29 or 30 years old.

Is this evidence "capable of proving that the real reason for his termination was discrimination based on age." *Nelson v. Boatmen's*, 26 F.3d at 801.

> Such evidence must include "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude" of an extent "sufficient to permit the jury to infer that that attitude was more likely than not a motivation factor in the employer's decision."

*Nelson v. J.C. Penney*, 75 F.3d at 345, quoting *Nelson v. Boatmen's*, 26 F.3d at 800.

Since some of the same people responsible for developing and implementing the Essential Functions test were the ones who reassigned, and eventually constructively discharged, the plaintiff, then the Court supposes it could be true that the standard set out above has been met, i.e., the development and implementation of the test could be construed to be "conduct ... by persons involved in the [decision to discharge her]." Accordingly, though the evidence pointed out to the Court thus far might be charitably called "thin," the Court will deny the summary judgment motion as it relates to plaintiff's disparate treatment theory of age discrimination under ADEA.

■ However, the Court will grant the motion as it relates to that part of Count III seeking redress for age discrimination under the Arkansas Civil Rights Act. The list of protected classes found at A.C.A. 16–123–105 does not include those over 40 or any other age group.

## D. Count II—Title VII and ACRA claims

■ The defendants argue that they are entitled to summary judgment on plaintiff's claims that the defendants violated her rights against sex discrimination and retaliation protected by Title VII and the ACRA. More specifically, the plaintiff alleges that (1) she was treated differently, i.e., less favorably than the two men who did not pass the test, and (2) she was retaliated against for suc-

cessfully suing the City in 1984 for sex discrimination.

The Court finds that on both Title VII theories the plaintiff has put forth a *prima facie* case and the defendants have offered non-discriminatory reasons for their actions in each case. The Court has carefully considered the pleadings and exhibits and holds that both issues, at least in this case, are highly fact intensive. The Court holds that the plaintiff will be allowed to put her Title VII claims before the jury, as well as her corresponding claims brought pursuant to the ACRA.

## E. The § 1983 claims

### 1. Hibbs and Tate individually

Defendants Hibbs and Tate argue that plaintiff's claims brought pursuant to 42 U.S.C. § 1983 should be dismissed for her failure to specify a *constitutional* right violated. However, it is not necessary for the underlying federal right in a § 1983 case to be one protected by the Constitution. The statute's protections are triggered by "the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws* ...." (emphasis added). *See Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (holding that phrase "and laws" actually "means what it says," and allows party to bring § 1983 action based on violation of the Social Security Act).

■ Deprivation of a right secured by Title VII, the ADEA, or ADA by one acting under color of state law constitutes grounds for a § 1983 claim. However, the portion of the plaintiff's § 1983 claim relating to the alleged ADA violation is prohibited by Hibbs' and Tate's qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

This Court holds that at the time plaintiff suffered the adverse employment decisions which gave rise to this lawsuit, it certainly was not "clearly established," within the meaning of *Harlow*, that obese individuals such as Ms. Morrow qualify as "individuals with disabilities" entitled to the protection of the ADA.

This decision is in accord with the Fourth Circuit's decision in *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995). "We find that neither the statutes, nor the caselaw, nor the applicable regulations clearly establish that the ADA or the Rehabilitation Act apply to the obese." *Id.*, at 1353.[7]

This can not be said, however, of the state of the law in sex, retaliation, or age cases. The law was settled long ago that one cannot discriminate on account of another's age or sex, nor can one retaliate against someone for engaging in a protected activity. Therefore, the qualified immunity protection described above will not affect plaintiff's § 1983 claim as it relates to the Title VII and age claims.

### 2. The City and Hibbs and Tate in their "official capacities"

For the reasons just mentioned, "mere laws" like Title VII, the ADA, and the ADEA can be the basis for § 1983 claims brought against cities and their officials acting in their "official capacities." However, municipal liability is limited to those claims based upon the implementation or execution of "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). There is no question that the policy at issue here was one adopted and implemented by the City of Jacksonville and its police department.

### F. The § 1981a "claim"

The defendants have figured out by now that in her complaint the plaintiff was making reference to § 1981a, not § *1981(a)*. Of course, § 1981a does not create an additional cause of action for employment discrimination plaintiffs, it merely provides the right to a jury trial to such a plaintiff [§ 1981a(c)], as well the possibility for compensatory and punitive damages if a plaintiff proves *intentional* discrimination. The Court finds that the

plaintiff was not pleading § 1981a as a separate cause so there is therefore nothing to dismiss.

### III. Summary

To recap the Court's rulings, in Part II–A the Court held that the Title VII, ADA, ADEA, and ACRA claims against defendants Hibbs and Tate in their individual capacities should be, and hereby are, dismissed. In Part II–B the Court held that whether the plaintiff is a "qualified individual with a disability" within the meaning of the ADA is a question for the jury. Therefore, summary judgment on Count I of plaintiff's complaint should be, and hereby is, denied. In Part II–C the Court struck the plaintiff's disparate impact theory of her age claim brought pursuant to the ADEA, but left in place her disparate treatment claim. In Part II–D the Court denied the summary judgment motion as to plaintiff's two Title VII theories: retaliation and disparate treatment based on sex. In Part II–E the Court held that the § 1983 claims based on Title VII and the ADEA violations would stand not only against Hibbs and Tate in their individual capacities, but also against the City and the chiefs in their official capacities.

The Court has sorted through the numerous claims & theories of claims the plaintiff started with and holds that only the following remain:

● Title VII claims, both sex discrimination (disparate treatment) and retaliation against the City and the chiefs in their official capacities;

● Corresponding claims under § 1983 against the City and the chiefs in both individual and personal capacities;

● A corresponding sex discrimination claim under the ACRA;

● An age claim under the ADEA against the City and the chiefs in their official capacities;

However, if the Court is wrong and she is so qualified, then defendants Hibbs and Tate enjoy qualified immunity on a § 1983 claim predicated on an ADA violation.

---

7. See Part II–B of this Order. Of course, the qualified immunity issue is moot if the Court's holding in Part II–B is correct, that is, that the plaintiff does not qualify to bring an ADA claim.

- Corresponding claims under § 1983 against the City and the chiefs in both individual and personal capacities.

- A disability claim under the ADA against the City and the chiefs in their official capacities;

- Corresponding claims under § 1983 against the City and the chiefs in their official capacities only;

- A corresponding disability discrimination claim under the ACRA.

\* \* \* \* \* \*

Accordingly, for the reasons set out above, defendants' motion is granted in part and denied in part.

IT IS SO ORDERED.