# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No.  97-4323

_____

Jeffrey Gorman,

        Plaintiff-Appellant,

    v.

Floyd Bartch; Steven Bishop, Chief, Kansas City Missouri Police Department; Emanuel Cleaver II; John Dillingham; Jack Headley; Jacqueline Paul; Bailus Tate; Donna Boley; Neil Becker; Stacey Daniels, Dr.; James F. Ralls, Jr.,

        Defendants-Appellees.

Appeal from the United States District Court for the Western District of Missouri.

_____

Submitted: May 14, 1998
Filed: August 20, 1998

_____

Before BEAM, LOKEN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Jeffrey Gorman, a paraplegic who uses a wheelchair, was injured while being transported after his arrest by Kansas City police officers.  He brought this action

against the members of the Kansas City Board of Police Commissioners, the chief of police, and the officer who drove the transport vehicle, claiming discrimination based on his disability in violation of Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).[1]  The district court granted summary judgment to the defendants, and Gorman appeals from the judgment.  We affirm in part and reverse in part.

## I.

Each side characterizes the facts in the record quite differently, but on our de novo review of the grant of summary judgment, we state them in the light most favorable to Gorman, the non-moving party.  Gerdes v. Swift-Eckrich, Inc., 125 F.3d 634, 637 (8th Cir. 1997).  A severe spinal cord injury requires Gorman to use a wheelchair, and in the early hours of May 31, 1992 he became involved in a disagreement at a Kansas City bar known as Guitars and Cadillacs.  When he and a friend began descending the steps to the dance floor, a bar employee told him he could not go down onto the dance floor.  Gorman protested that he was entitled to go there, but the employee told him "you're out of here" and began to pull his wheelchair up the steps.  Gorman was evicted from the bar.  When he demanded to be readmitted, employees at the door refused.  Gorman then approached two police officers to tell them what had happened and to request their help in getting back into the bar.  He began to argue with them, and they eventually arrested him for trespassing and called for transportation to take him to the police station.

---

[1]He also alleged negligence, but his negligence claims were dismissed by the district court and he has not discussed them in his briefing or argument on appeal. They are therefore considered abandoned.  Jasperson v. Purolater Courier Co., 765 F.2d 736, 740-41 (8th Cir. 1985).

In response to the call officer Neil Becker arrived with a patrol wagon that was not equipped with a wheelchair lift or wheelchair restraints. Gorman told the police that the van was not properly equipped for him to ride in it, and that due to his use of a urine bag it would be necessary for him to go to the bathroom before he was transported. The officers lifted Gorman from his chair and placed him on a bench inside the van. Gorman states that they complied with his instructions on how to lift him from his chair, but not with his requests that he be allowed to go to the bathroom prior to transport or that they place the seat cushion from his wheelchair underneath him to help support his legs. Because of his paraplegia Gorman was not independently able to maintain himself upright on the bench, and the police tied him with his belt to a mesh wall behind the bench and also fastened a seatbelt around him. During the drive to the station the belts came loose, and Gorman fell to the floor. The fall injured his shoulders and back severely enough to require surgery and also broke his urine bag, leaving him soaked in his own urine.

Gorman filed this action, alleging violation of his rights under the ADA and the Rehabilitation Act and negligence in his handling. Gorman sued police chief Steven Bishop; commissioners Emmanuel Cleaver, John Dillingham, Jack Headley, Jacqueline Paul, and Bailus Tate; and police officer Neil Becker. Donna Boley, Stacy Daniels, and James Ralls were added when they replaced Paul, Dillingham, and Tate as members of the board of police commissioners, as was Floyd Bartch when he succeeded Bishop as chief of police. Gorman alleged that the board members and the chief failed to provide a proper transportation vehicle to accommodate his condition, to modify department policies and procedures dealing with arrest and transportation to accommodate individuals with spinal cord injuries, and to institute proper training for Kansas City police officers on how to handle such arrestees. He claimed that the manner of his post-arrest handling and transportation evidenced unlawful discrimination by all the defendants, including Becker who drove the police van that took him to the station. His complaint sought compensatory damages for physical and mental injuries,

punitive damages, injunctive relief compelling the defendants to comply with the statutes, and attorney fees and costs.

The defendants filed several motions in the district court, including motions for summary judgment, and the parties submitted affidavits and deposition testimony from Gorman, several defendants, and other witnesses. The district court disposed of the issues on summary judgment in two separate orders. The first order dismissed all the negligence claims[2]; dismissed all claims against the defendants in their individual capacities on the basis of qualified immunity; and dismissed all other claims against former commissioners Dillingham, Paul, and Tate, as well as former police chief Bishop.[3] The only claims which remained after the first order were therefore the statutory claims against the remaining defendants in their official capacities. The second order concluded that the two federal statutes did not cover Gorman's claims because he did not fit the ADA definition of a "qualified individual with a disability." Such a qualified individual must meet "the essential eligibility requirements for the receipt of services" of the public entity, and the court construed this statutory language to mean services voluntarily sought, which would not include those incident to an arrest. The court also reasoned that Congress had not shown it intended to extend the

---

[2]The court held the negligence claims failed under Missouri law. It reasoned that the defendants in their individual capacities were engaged in discretionary acts and that the official capacity claims were barred by sovereign immunity because they did not fit statutory exceptions for negligent operation of a motor vehicle in the course of official duty or for maintaining dangerous conditions on public property. See Mo. Rev. Stat. § 537.600.

It is not clear from the complaint whether the claim for punitive damages was based only on negligence. This court has not addressed whether punitive damages are available under Title II of the ADA and § 504, but the Sixth Circuit has ruled they are not. See Moreno v. Consolidated Rail Corp., 99 F.3d 782, 792 (6th Cir. 1996).

[3]The order specified that Floyd Bartch would be substituted for Bishop as to any official capacity claims.

statute to a core state function such as police work, citing in support <u>Torcasio v. Murray</u>, 57 F.3d 1340 (4th Cir. 1995) (qualified immunity for state prison officials sued under the ADA). A final judgment was not entered until after Gorman's initial attempt to appeal,[4] and the court's order for judgment added a citation to <u>Aswegan v. Bruhl</u>, 113 F.3d 109 (8th Cir. 1997), <u>cert denied sub nom</u> <u>Aswegan v. Emmett</u>, 118 S.Ct. 383 (1997) (leaving open the question of whether the ADA applied to state prisons, but rejecting the claim that an individual cable television hookup in an infirmary cell was a public service to which the plaintiff was entitled where cable television was available in the infirmary recreation area adjacent to his cell).

On appeal Gorman argues that he is a qualified individual with a disability, that the statutes do not distinguish between public services that are voluntarily sought and those that are not, that transporting arrestees is a program or activity covered by the ADA and the Rehabilitation Act, that he was discriminated against by not receiving transportation that was safe in light of his disability, and that the defendants are not entitled to qualified immunity since the applicable law was clearly established at the time of his arrest and transportation.[5] The police defendants argue in response that Gorman is not a qualified individual with a disability since he did not voluntarily seek police transportation, that such transportation is not a service or activity covered by the statutes, that Gorman was not discriminated against based on his disability, and that they are entitled to qualified immunity.

---

[4]<u>See</u> <u>Gorman v. Bartch</u>, 123 F.3d 1126 (8th Cir. 1997).

[5]The United States was initially permitted to intervene in the district court because of a constitutional challenge to Title II as void for vagueness, and it has filed an amicus brief on this appeal which argues that Title II of the ADA and § 504 of the Rehabilitation Act apply to all operations of a police department and to the type of allegations raised by Gorman. The district court's ruling upholding the constitutionality of the statute has not been appealed.

The task before this court then is essentially twofold: to determine 1) whether Gorman has presented claims cognizable under the ADA and the Rehabilitation Act, and 2) whether the defendants sued in their individual capacities are entitled to qualified immunity.

## II.

Analysis of whether Gorman's allegations can be pursued under Title II of the ADA and § 504 of the Rehabilitation Act must begin with the language of the statutes themselves, Watt v. Alaska, 101 S.Ct. 1673, 1677 (1981), and their plain language must be given effect. Connecticut National Bank v. Germain, 112 S.Ct. 1146, 1149 (1992).

The Rehabilitation Act became effective in 1973, and § 504 of the act provides that "[n]o otherwise qualified individual with a disability" shall "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The reach of this statutory language is demonstrated by the definition of "program or activity" to include "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b). To prevail on a claim under § 504, a plaintiff must demonstrate that: 1) he is a qualified individual with a disability; 2) he was denied the benefits of a program or activity of a public entity which receives federal funds[6], and 3) he was discriminated against based on his disability. 29 U.S.C. § 794(a); Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998). Defendants may demonstrate as an affirmative defense that a

---

[6]No argument has been raised in this case that the Kansas City police department does not receive federal funds, and Bishop testified in his deposition that it did.

requested accommodation would constitute an undue burden. 29 U.S.C. § 794a(a)(1); Barth v. Gelb, 2 F.3d 1180, 1183 (D.C. Cir. 1993). Plaintiffs who prevail on Rehabilitation Act claims are entitled to the full spectrum of legal and equitable remedies needed to redress their injuries. Lue v. Moore, 43 F.3d 1203, 1205 (8th Cir. 1994); Rodgers v. Magnet Cove Public Schools, 34 F.3d 642, 644 (8th Cir. 1994).

The ADA consists of three titles addressing discrimination against the disabled in different contexts. Title I prohibits employment discrimination, 42 U.S.C. § 12112, Title II prohibits discrimination in the services of public entities, 42 U.S.C. § 12132, and Title III prohibits discrimination by public accommodations involved in interstate commerce such as hotels, restaurants, and privately operated transportation services, 42 U.S.C. §§ 12182, 12184. Title II took effect in January of 1992 and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is broadly defined as any person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). The term "public entity" is defined to be "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and "cases interpreting either are applicable and interchangeable." Allison v. Department of Corrections, 94 F.3d 494, 497 (8th Cir. 1996). The statute itself states that "[t]he remedies, procedures, and rights" under § 504 are also available under Title II. 42 U.S.C. § 12133; see also Layton, 143 F.3d at 472; Hoekstra v. Independent School Dist. No. 283, 103 F.3d 624, 626-27 (8th Cir. 1996). A plaintiff under Title II of the ADA must therefore similarly show that he is a qualified individual with a disability denied participation in, or the benefits of, the

services, programs, or activities of a public entity because of his disability. Layton, 143 F.3d at 472. The defendants may also raise as an affirmative defense that the requested accommodation of the plaintiff's disability would constitute an undue burden, requiring "a fundamental alteration in the nature of a service, program, or activity or in undue financial or administrative burdens." See 28 C.F.R. § 35.150(a)(3).

Our task in considering whether Gorman's allegations come under the ambit of the federal statutes has been made easier by the Supreme Court's unanimous decision on June 15 in Pennsylvania Department of Corrections v. Yeskey, 118 S.Ct. 1952 (1998). In applying Title II of the ADA to state prisons and prison services, Justice Scalia emphasized the broad language used by Congress and its choice not to include exceptions. Id at 1954. State prisons "fall squarely within the statutory definition of 'public entity'" since § 12131(1)(B) defines public entity as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." Id at 1954-55. The Court categorically rejected the argument that the statutory prohibition against excluding a qualified individual with a disability from participating in or receiving the "benefits of the services, programs, or activities of a public entity" does not apply to prison services because they do not fit the common understanding of "benefits" or "services," for "[t]he text of the ADA provides no basis for distinguishing these programs, services, and activities." Id at 1955.

Application of Yeskey to the claims in this case shows that they also fit under the ADA. A local police department falls "squarely within the statutory definition of 'public entity,'" id at 1954, just like a state prison. The fact that Gorman may not have "volunteered" to be arrested does not mean he was not eligible to receive transportation service to the police station. Covered programs or services do not need to be voluntary, for "the words [of the statute] do not connote voluntariness." Id at 1955. A qualified individual may participate in a service on either a voluntary or a mandatory basis, as illustrated by Justice Scalia's example of a drug addict required to participate in a treatment program. Id. Transportation of an arrestee to the station house is thus

a service of the police within the meaning of the ADA. The fact that the statute can be "applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." Id at 1956 (internal citations omitted). It was therefore error to conclude that Gorman was not a "qualified individual with a disability" who "meets the essential eligibility requirements for the receipt of services."[7] 42 U.S.C. § 12131.

The stated purpose of the ADA also demonstrates its applicability to transportation of arrestees. In the statement of findings and purpose at the beginning of the statute, Congress noted that "discrimination against individuals with disabilities persists in such critical areas as...transportation...institutionalization...and access to public services" and that disabled individuals face the discriminatory effects of "failure to make modifications to existing facilities and practices." 42 U.S.C. 12101(a). Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b).

The regulations promulgated to guide implementation of the statute are also instructive. The Department of Justice specified that the statutory term "program" includes "the operations of the agency or organizational unit of government receiving or substantially benefitting from the Federal assistance awarded, e.g., a police department or department of corrections." 28 C.F.R. § 42.540. The regulations also indicate that "benefit" includes "provision of services, financial aid, or disposition (i.e., handling, decision, sentencing, confinement, or other prescription of conduct)." Id.

---

[7]Yeskey also undercuts the point made by the district court in reliance on Torcasio that the ADA does not indicate that it applies to core state functions such as prisons. Justice Scalia emphasized that the statutory language "plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt." Yeskey, 118 S.Ct. at 1954 (emphasis in original).

The commentary also made clear that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities."  28 C.F.R. § 35, App. A, Subpart B.

Gorman's allegations that the defendants denied him the benefit of post-arrest transportation appropriate in light of his disability fall within the framework of both Title II of the ADA and § 504 of the Rehabilitation Act.  The defendants are representatives of the Kansas City police establishment, a department of local government and a public entity.  Arrestee transportation is a program or service of the department as shown by record evidence that vehicles are dispatched by the department to transport arrestees. The statutes must be interpreted broadly to include the ordinary operations of a public entity in order to carry out the purpose of prohibiting discrimination.  Innovative Health Systems v. City of White Plains, 117 F.3d 37, 44-45 (2nd Cir. 1997).  The "benefit" Gorman sought in this case was to be handled and transported in a safe and appropriate manner consistent with his disability.  See 28 C.F.R. § 35.130(b)(1) (public entity may not provide services in a manner denying disabled individuals equal benefit of the service).  His allegations are different from cases in which plaintiffs sought unique benefits or services.  See e.g., Aswegan, 113 F.3d at 110; Lue v. Moore, 43 F.3d 1203, 1206 (8th Cir. 1994) (Rehabilitation Act did not require creation of new prison vocational training program).

Because Gorman's allegations pass the threshold required to bring a case under the ADA and the Rehabilitation Act, the district court's ruling to the contrary must be reversed and the case remanded for further proceedings.  It remains to be determined whether Gorman can prove he was discriminated against or denied a benefit or service because of his disability or whether the defendants can show they made reasonable accommodations of his disability or if further accommodation would have been an undue burden.  29 U.S.C. § 794a(a)(1); 42 U.S.C. § 12133.  The facts of what actually occurred on the night of the arrest are contested.  The defendants dispute Gorman's

version. They have produced evidence that he was intoxicated, that he repeatedly wheeled his chair into the street and yelled profanities, that he did not tell the police how to transport him safely, and that he fell to the floor of the van because he released his seatbelt. We resolve only the threshold issue at this time, and we are not in a position to assess what the evidence shows about relevant details of Gorman's condition or about the information and options available to the police. The factual record will need to be further developed on remand before the remaining issues of potential liability and possible relief are determined.

## III.

Gorman also challenges the district court's determination that the defendants are entitled to qualified immunity in their individual capacities. The district court granted summary judgment on the claims against the defendants in their individual capacities based on its conclusion that the applicability of Title II of the ADA and § 504 of the Rehabilitation Act to the transportation of an arrestee was not clearly established at the time of Gorman's arrest. Gorman concedes on appeal that defendants Bartch, Boley, Daniels, and Ralls are not subject to liability in their individual capacities because they assumed their positions after the events giving rise to his claims and they were therefore sued only in their official capacities. He argues that the district court erred in dismissing the individual capacity claims against the remaining defendants, however, because the applicability of the statutes to his transportation was clearly established. The defendants argue in response that their conduct did not violate clearly established rights under the statutes.[8] We review de novo the decision granting qualified immunity. Rowe v. Lamb, 130 F.3d 812, 814 (8th Cir. 1997).

---

[8]Since the defendants did not appeal the district court's conclusion that they were sued in both their official and individual capacities, they have waived any argument about the correctness of that determination. In re Sherman, 67 F.3d 1348, 1357 n. 10 (8th Cir. 1995).

Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. See Hafer v. Melo, 112 S.Ct. 358 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. Id at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. Id at 362.

The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates "clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 102 S.Ct. 2727, 2738 (1982). The availability of the defense should ordinarily be resolved at the earliest opportunity to avoid unnecessary cost and excessive interference with government operations. Id. Whether the controlling legal principle has been clearly established is not to be determined at the most general level of legal abstraction, but by consideration of whether a reasonable official would have known the conduct in question was unlawful in light of information available at the time. Anderson v. Creighton, 107 S.Ct. 3034, 3039-40 (1987).

The factual record before the court on the summary judgment motion based on qualified immunity consisted of affidavits and portions of depositions. Commissioner Dillingham testified in his deposition that shortly after the ADA was passed, the commissioners were notified by a police department representative that the law had been enacted and that it might apply to the operations of the department. He did not recall any formal discussion of the impact of the law on department operations, however, or of any perceived need for an official policy to ensure compliance with the law or information about how other police departments were responding. Dillingham

-12-

testified that the commissioners relied on the department to develop procedures to comply with the new law and that board minutes would have disclosed if there had been discussion of the ADA or any policy under it. Commissioner Headley testified that when the board was informed of a new law by its legal department, it would commonly wait for appropriate procedures to be developed by the police department; the board's role was to review and approve policy. Suzanne Owen, an assistant to the board, reviewed minutes of the meetings prior to Gorman's arrest and found no discussion about the design or provision of patrol wagons.

Chief Steven Bishop stated in his deposition that he had been aware of the existence of the ADA, but that he was not familiar with the Rehabilitation Act and that he did not know the effective date of either statute. While department officials had attended some training sessions on the ADA, he had delegated responsibility for developing department procedures to comply with the law to a deputy chief and he was not aware of any training that had been conducted for rank and file police officers. Major Dean Kelly, the director of personnel, testified that in September of 1991 a committee had been created which made a series of recommendations on how to achieve compliance with the ADA. These recommendations dealt primarily with reconfiguring department job descriptions and other employment issues, however, and Kelly was not aware of any dealing with arrest and transportation procedures. Commander Thomas Daly of the planning and research division testified that the department had conducted training on how to handle wheelchairs, but that he did not recall when. Officers are trained to handle arrestees "in whatever state we find them," but Daly was not aware of any specific written policies on handling arrestees in wheelchairs or any meetings discussing the applicability of the ADA to arrest and transportation. Pete Richardson, manager of fleet operations for the department, testified that none of its vehicles had been equipped to handle wheelchairs at the time of Gorman's arrest, but that they have all since been fitted with "hold downs" which permit a wheelchair to be transported without removing the arrestee from the chair.

Officer Neil Becker testified in his deposition that he had been a patrol officer with the department for over twenty years and that he had received no special training to operate a patrol wagon. Any officer could be assigned to drive one during a particular shift. He recalled that he and the other officers on the scene asked Gorman some questions about the logistics of transporting him, but he did not remember exactly what Gorman said he needed or whether he asked to have his seat cushion under him for support. He did not recall receiving any training prior to Gorman's arrest on compliance with the ADA or handling arrestees with spinal cord injuries and was not aware of any department policies or procedures for the handling of arrestees with disabilities.

At the time of Gorman's arrest in May of 1992, Title II of the ADA had only been in effect for some four months. Despite the clear language of the statute, there was uncertainty about the extent of its coverage. There were no cases addressing its possible application to government agencies like police departments or to the transportation of arrestees. Although there were some cases applying the Rehabilitation Act to prisons, there were none dealing with facts similar to those alleged by Gorman. See Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991) (HIV positive inmates seeking access to prison programs); Bonner v. Lewis, 857 F.2d 559 (9th Cir. 1988) (prisoner's claim for qualified interpreter in disciplinary hearings). In the intervening years until the Supreme Court decided Yeskey, courts divided on the applicability of the ADA and Rehabilitation Act to state prisons. Compare Yeskey v. Pennsylvania Dept. of Corrections, 118 F.3d 168 (3rd Cir. 1997) (participation in prison boot camp program covered), Crawford v. Indiana Dept. of Corrections, 115 F.3d 481 (7th Cir. 1997) (blind inmate's access to prison education and recreation programs covered), with White v. Colorado, 82 F.3d 364 (10th Cir. 1996) (denial of surgery for prisoner's preexisting injury not covered), Torcasio, 57 F.3d 1340 (4th Cir. 1995) (application to obese prisoner's claim for larger cell and alternative recreation not clearly established). Moreover, much of the early attention to the ADA was focused on employment and physical access issues.

Under the circumstances it cannot be said that reasonable police officials in May of 1992 would have known that the actions alleged against the individual defendants in respect to the transportation of a disabled arrestee were subject to, and in violation of, Title II of the ADA or § 504 of the Rehabilitation Act. The defendants are therefore entitled to qualified immunity in their individual capacities, and we affirm that ruling by the district court.

## IV.

The district court ultimately dismissed all of Gorman's claims for damages and injunctive relief by concluding that his claims against the defendants in their official capacities could not go forward since the statutes did not apply to arrestee transportation by a police department. As already discussed, Gorman's complaint passes the statutory threshold under Yeskey and the claims against the defendants in their official capacities must be remanded for further development. It remains to be seen whether he can show he was discriminated against or denied a benefit because of his disability or that the defendants had a policy or custom that violated his rights under the ADA or the Rehabilitation Act, and the defendants can also raise issues of reasonable accommodation and undue burden.

The judgment dismissing all claims is vacated, and the conclusion of the district court that the ADA and the Rehabilitation Act do not cover Gorman's allegations is reversed. We affirm the dismissal of the claims against the defendants in their individual capacities on the basis of qualified immunity, and remand the official

-15-

capacity claims against Bartch, Cleaver, Headley, Boley, Daniels, Ralls, and Becker[9] for further proceedings not inconsistent with this opinion.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[9]Officer Becker is not alleged to have had any policy making function, and it is unclear what liability he might have in his official capacity, but the district court indicated that he was also sued in this capacity, and he has not appealed this determination.

-16-